### SWAFFORD v. VERMILLION.

#### No. 35688.

Supreme Court of Oklahoma

Sept. 15, 1953.

W. R. Kerr and R. H. Linker, Tulsa, for plaintiff in error.

Merrill S. Bernard, Tulsa, for defendant in error.

BLACKBIRD, Justice.

Undisputed facts, forming the background of the present action, as disclosed at its trial, are as hereinafter related.

Plaintiff in error, hereinafter referred to as defendant, has for a number of years operated an automobile loan business in Tulsa, Oklahoma. In recent years she acquired a used car business there. In 1947, she employed Jim Colvin, with whom she had been personally acquainted for several years previously, as a salesman in the used car business. This business shared a used car lot with another dealer named

Doll. Colvin was paid regular commissions on cars he sold in the business.

On February 28, 1949, a salesman from the Fred Jones Ford Company, accompanied by Colvin, drove a 1942 Model Lincoln Zephyr Sedan automobile to defendant's home and there effected a sale of it. She gave the salesman a check in the amount of $1,000 for the car, but the salesman didn't have the certificate of title to it with him. This "title" was later that day delivered to her by the Fred Jones' saleman and, according to her undisputed testimony, she placed it in a drawer where she usually kept such papers. The car was then placed on her used car lot for sale. When the assignment on the back of the aforementioned certificate was executed by the Fred Jones Company, the space provided thereon for the name of the assignee was left blank, as was shown to be quite often done in such sales. Some time later the name: " 'Colvin' or 'Calvin' Mtr. Co." was inserted in this space and thereafter a new certificate of title, dated March 1, 1949, was executed in the name of "Calvin Motor Co." According to other undisputed testimony, Jim Colvin frequently used this car on personal missions while it was being exhibited for sale, and the Fred Jones Company's record of the transaction represented the auto as having been purchased from it by a "Colvin Motor Company."

On the 13th or 14th of May, 1949, defendant discharged Mr. Colvin from her employ.

On June 2, 1949, or a day or two before, Mr. Colvin, apparently, and by some means not specified in the evidence, obtained both the "title" and the Lincoln Zephyr automobile from defendant's used car lot and brought it to a used car auction sale in Oklahoma City, Oklahoma. Though the evidence indicates he had no used car dealer's license himself, Mr. Colvin registered the automobile to be sold at the auction and just before it was brought into the "ring" to be placed on the auction block, a Mr. Chapman, one of his dealer acquaintances from Sapulpa, saw the car and purchased it from Colvin for $650. According to Chapman's undisputed testimony, he asked Colvin no questions concerning the ownership of the car, after ascertaining that the latter had the (certificate of) title to it. Chapman then allowed the car to go on into the "ring" where it was auctioned off to Mae Vermillion, one of his friends in the used car business at Oklahoma City, for a price "in the vicinity of" $740. The certificate of title furnished this said purchaser bore one assignment on the back thereof executed "Calvin Motor Co., by Jim Colvin" to E. T. Chapman, and another from E. T. Chapman to her, both assignments being subscribed and sworn to before the same Notary Public on June 2nd. With this certificate, Mrs. Vermillion procured a new "title" executed in her name and after some repairs to the car, she and her husband, pursuant to a message telling of the serious illness of her daughter in Louisville, Kentucky, started on an overland trip there in this automobile.

In the meantime, defendant had discovered that the car was missing from her used car lot in Tulsa, reported it to the police there as being stolen, and indicated to them that she suspected Jim Colvin as the person guilty of the theft. This Police Department thereupon sent out to police in Missouri a radiogram stating, among other things, that Jim Colvin was wanted for "car theft" and describing both him and the Lincoln Sedan.

After receiving that information Missouri officers discovered the car traveling through the town of Cuba, in that State, about midnight, June 4th, and stopped it. After accusing plaintiff's husband of being "Jim Colvin" and having stolen the car, they examined the certificate of title which plaintiff and her husband exhibited, together with certain identifying cards and documents they had with them. Apparently, still not convinced that plaintiff and her husband were innocent of stealing the car, the officers then took it to a garage there, locked it and kept the keys while they took plaintiff and her husband to the Cuba jail. Two or more hours later the officers removed her from the jail and took her to a hotel. According to plaintiff, one of the officers instructed the hotel

clerk to keep a watch on her but allow her to telephone her son-in-law in Kentucky to.. inquire about her daughter's condition. When this was done, the son-in-law, according to plaintiff, telephoned Oklahoma City, and in some manner, was able ·to get her and her husband released to come to Tulsa .to meet with the defendant. Pursuant to this arrangement, plaintiff and her husband returned to Oklahoma by bus and after they entered into a stipulation with defendant authorizing the release of the car to them, they returned to Missouri, procured the Lincoln, and continued their trip to Kentucky. Thereafter, when they returned to Oklahoma City, according to plaintiff's testimony, they found their partner in the used car business had been hospitalized, their stock of used cars repossessed by the finance company, and their used car business no longer in operation. Plaintiff and her husband finally sold the Lincoln automobile in November, 1949, for $720.

In March, 1950, plaintiff commenced this action in which she sought damages from the defendant for "unlawful . arrest, detention and imprisonment." In her first cause of action she prayed for judgment in the sum of $20,000, alleging that the arrest and imprisonment caused her to suffer "great anxiety * * *, to become ill" and also suffer embarrassment, humiliation and loss of her used car business. In her second cause of action plaintiff sought the sum of $850 in damages allegedly resulting from the "unlawful detention" of the Lincoln automobile and its resulting. depreciation in value, together with attorney's fees, transportation costs and other expenses allegedly incurred by reason of defendant's wrongful acts.

Defendant answered by way of general denial and added to this a cross petition in the nature of a counterclaim against plaintiff for the sum of $1,250 alleging. in substance that Jim Colvin had obtained the automobile from her fraudulently and that the facts with reference to his said fraud were known, or with the exercise of ordinary diligence could have been known, by plaintiff before she purchased it; that plaintiff had broken her agreement with defendant to ·return the car to Tulsa County, and had converted same to her own use and benefit, selling it and keeping the proceeds of said sale, to defendant's damage, in the sum of $1,250, the alleged value of the car at the time it was unlawfully taken from her possession.

At the close of the trial, the jury returned a verdict denying defendant any recovery on her cross petition and fixing plaintiff's damages against her ·at the sum of $3,500. Judgment was entered accordingly. After defendant's motion for a new trial was overruled, she perfected the present appeal.

Defendant first contends that the trial court erred in overruling her motion for a directed verdict. In support of this assigned error, she argues that the undisputed evidence shows she had "probable cause" for doing what she did in the matter of recovering her automobile. She cites "malicious prosecution" cases for the proposition that the existence of probable cause constitutes a complete defense in such actions and that where the material facts with reference to this element are not disputed, the Court errs in refusing to direct a verdict for the defendant. There has been some confusion and difference of opinion among the authorities upon these matters. For instance in S. H. Kress & Co. v. Bradshaw, 186 Okl. 588, 99 P.2d 508, 512, this Court included in its opinion a quotation from 22 Am.Jur. 356, Sec. 4, a portion of which is as follows:

. " * * * It is not necessary that the wrongful act which results in detention or restraint be under color or any legal or judicial proceeding, *nor do lack of malice, the presence of good faith, or the presence of probable cause for the imprisonment affect the existence of the wrong* when the detention is unlawful. * * *" (Emphasis added.)

At page 370, Section 28, of the same volume and title of American Jurisprudence appears the following:

"According to the great weight of authority, the want of probable cause

is not an essential element of the action for false imprisonment, and the presence of probable cause for the imprisonment is not *generally* a defense to the action.

\* \* \* \* \* \*

"However, the question of probable cause becomes material \* \* \* where the defense to the act is ·that the defendant was acting in protection of his person or property." (Emphasis added).

And on page 408 of the same Work, it is said:

"\* \* \* \* \* \*

"Ordinarily, also, the owner of property, in the exercise of his inherent right to protect the same is justified in restraining another who seeks to interfere with or injure it where the restraint or detention is *reasonable* in time and manner. In such cases, probable cause is a defense even though the injury which is about to be inflicted constitutes only a misdemeanor, for it is the existence of *reasonable ground to suppose* that one's \* \* \* property is in danger which gives rise to the right of protection. \* \* \* (Emphasis added).

In discussing and reconciling the apparent disagreement in the authorities referred to in the above, the Court, in Collyer v. S. H. Kress & Co., 5 Cal.2d 175, 54 P. 2d 20, 23, said:

"\* \* \* However, those authorities which hold, where a person has reasonable grounds to believe that another is stealing his property, as distinguished from those where the offense has been completed, that he is justified in detaining the suspect for a reasonable length of time for the purpose of investigation in a reasonable manner \* \* \* must necessarily proceed upon the theory that probable cause is a defense. And this is the law because the right to protect one's property from injury has intervened. In an effort to harmonize the individual right to liberty with a reasonable protection to the person or property of the defendant, it

should be said in such a charge of false imprisonment, where a defendant had probable cause to believe that the plaintiff was about to injure defendant in his person or property \* \* \* that probable cause is a defense, *provided,* of course, *that the detention was reasonable.* \* \* \*" (Emphasis added.)

In 22 Am.Jur. 358, Sec. 7, under "False Imprisonment", it is further said:

"A person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or *with knowledge that such confinement will, to a substantial certainty, result from it.*

 \* \* \* \* \* \*

"*If an act is done with the intention of affecting a third person and it imposes a confinement upon another, the wrongdoer is liable to such other as fully as though it were intended so to affect him.*" (Emphasis added.)

Views similar to those above quoted have become the basis for rules now incorporated in the American Law Institute's Restatement Of The Law Of Torts, and we think they are correct. See Volume 1, Secs. 43 and 80 thereof. At page 167, under Section 77, of that Volume, it is said that the detention or imprisonment is privileged for the purpose of terminating another's intrusion upon the actor's possession of chattels if the other's intrusion is not privileged, or, though privileged, the other intentionally or negligently causes the actor *to believe* his intrusion to be unprivileged, and: the actor *reasonably believes* that the other's intrusion can be terminated only by (such detention or imprisonment), and the means which the actor uses to prevent or terminate the intrusion *are reasonable,* and the actor has first requested the other to desist from the intrusion and the other has disregarded the request or the actor *reasonably believes* that a request will be useful.

██ Applying the major portion of the above rules to this case, it will be seen that the defendant was entitled to be exonerated of plaintiff's charges of "unlawful" or false imprisonment and detention, if the

Lincoln Zephyr automobile involved was her property, if in her reporting to the Tulsa Police she was acting to protect her property rights therein, and, assuming that she acted for the purpose or with a "substantial" certainty that officers, as a result of the report, information and/or instructions given to them, would trace said automobile and attempt to recover it for her, and, in so doing or in connection therewith, detain some other person or persons against his or their will, and, if the means she chose for terminating said intrusion upon her said property rights, was a reasonable one, and, if under the circumstances, she was reasonably justified in believing that less drastic measures would not serve the purpose. Aside from the question of whether or not Jim Colvin or the defendant was the true owner of the automobile, whether he stole or only embezzled it, whether she negligently or deliberately placed it within his power to do what he did with the car and whether, because of any facts within her knowledge, some of which were not revealed in her own testimony, she was without justification or reasonable cause for believing the auto had been stolen (about which the evidence from the Fred Jones Motor Company and the testimony of C. C. Cook and Mr. Doll tended to inject some doubt), we think a mere reading of the above hypothesis and reference to the emphasized portions of the above views and rules pertaining to what would be "reasonable" under the circumstances, makes it obvious that cases of this character, perhaps more than most, must often depend for determination in their various phases upon the conclusions of a jury. It is difficult to formulate a single rule applicable to all cases that will clearly show when the question of probable cause is one of law for the court, when it is one of fact for the jury, and when it is a mixed question of law and fact. As to this subject in malicious prosecution cases, compare Miller v. Bourne, 208 Okl. ——, 256 P.2d 431; Patrick v. Wigley, 206 Okl. 194, 242 P.2d 423; Gray v. Abboud, 184 Okl. 331, 87 P.2d 144. One of the better and closer approaches to such a pronouncement was undertaken in the early case of

Cochran v. Toher, 14 Minn. 385, 14 Gil. 293, cited in the annotations to Leger v. Warren, 62 Ohio St. 500, 57 N.E. 506, 51 L.R.A. 193, 225. In Clements v. Canon, 170 Okl. 340, 40 P.2d 640, this court held that where "there is a conflict in the evidence as to the existence of reasonable cause * * * it is the duty of the court to leave the question of reasonable cause to the jury under appropriate instructions." In view of the many questions in this case, including that of defendant's probable cause, or lack of it, for her conduct, which, could properly be determined only in the light of what was "reasonable", what was "a substantial certainty", etc., in the "minds of ordinary men" (Cochran v. Toher, supra), the trial court committed no error in overruling defendant's motion for a directed verdict and submitting the case to the jury.

 Defendant also makes many allegations of error concerning the trial judge's instructions to the jury. In one of these, she complains of his refusal to give her Requested Instruction No. 5, dealing with probable cause. As seen from the above authorities, probable cause may be a decisive factor in an action of this kind, and on the basis of the conflicting evidence, it was in the present one. Our examination of the instructions given, reveals that they contain no reference, whatsoever, to to it. It is elementary that one of the most important duties of a trial judge is to properly instruct the jury on the issues of the case, especially when properly and timely requested to do so. See Patrick v. Wigley, supra; Union Transp. Co. v. Mitchell, 203 Okl. 247, 219 P.2d 1015; Thompson v. Galion Iron Works & Mfg. Co., 201 Okl. 182, 203 P.2d 438. And whether his instructions are first reduced to writing or it is done by word of mouth, only, as in this case, effects no change in this principle. Here, there was competent evidence from which the jury might have found, had the issue been submitted to them, that the defendant had probable cause for acting as she did to protect her claimed property rights in the automobile involved. If they had, and had also found in her favor on the other phases of the

case, some of which we have mentioned, she would have been entitled to complete exoneration at their hands. As we deem the court's refusal in this particular a fatal error, it is unnecessary to consider other alleged errors.

The judgment is reversed with instructions to the trial court to set it aside and grant a new trial in this cause.

JOHNSON, V. C. J., and WELCH, CORN, DAVISON and WILLIAMS, JJ., concur. O'NEAL, J., concurs in result.