Teresa GARCIA, a minor, by her next friends Max and Sandra GARCIA, Plaintiff-Appellant,

v.

Theresa MIERA, J.D. Sanchez, Edward Leyba, Judi Mestas, and Felix Duran, Defendants-Appellees.

No. 85–1641.

United States Court of Appeals, Tenth Circuit.

April 28, 1987.

John B. Roesler of Wolfe, Roesler, Romero & Lamar, Santa Fe, N.M., for plaintiff-appellant.

Daniel H. Friedman of Simons, Cuddy & Friedman, Santa Fe, N.M., for defendants-appellees.

---

Before HOLLOWAY, Chief Judge, LOGAN, Circuit Judge, and BOHANON, District Judge.*

LOGAN, Circuit Judge.

In this appeal we review a district court's grant of summary judgment, finding that school officials involved in two incidents of corporal punishment were insulated from liability under 42 U.S.C. § 1983 by qualified immunity.

Teresa Garcia, an elementary school pupil in New Mexico, by her parents and next friends, Max and Sandra Garcia, sued the defendants in their individual capacities for denying her substantive due process in violation of 42 U.S.C. § 1983 because of two beatings [1] suffered at their hands. After considerable discovery, the defendants filed a motion for summary judgment, which the court granted. The district court concluded that the defendants were shielded from liability "by the defense of good faith immunity," R. I, 306, because the "law governing whether excess corporal punishment can give rise to a substantive due process claim is not clearly established." *Id.* at 308. Garcia has appealed the court's order, contending that at the time of the beatings excessive corporal punishment by school officials did violate her clearly established substantive due process rights.

In 1982 Garcia was a nine-year-old student in the third grade at the Penasco Elementary School in Penasco, New Mexico. On February 10, 1982, defendant-appellee Theresa Miera, the school principal, summoned Garcia to her office for hitting a boy who had kicked her. Miera instructed Garcia to go to her chair to be paddled. Garcia refused and told Miera that her father had said that "Mrs. Miera had better shape up." [2] R. I, 136.

* The Honorable Luther L. Bohanon, Senior United States District Judge for the Western District of Oklahoma, sitting by designation.

1. We are aware that using the word "beatings" connotes excessive force; while "paddling" may imply reasonable force. But because factual disputes may not be resolved on summary judgment, in reviewing the court's order we must construe the facts in the light most favorable to the non-moving party. *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir.1984).

Accordingly, for the purposes of this appeal, we take Garcia's allegations to be true and we state the facts in the light most favorable to her as we have reconstructed them from the complaint, the affidavits, and excerpts from depositions presented to the district court.

2. Miera cited the father's admonition to "shape up" on a school discipline record form as a reason why the corporal punishment was inflicted. R. I, 104.

Miera responded by calling defendant J.D. Sanchez, a teacher at the school, for assistance. Sanchez held Garcia upside down by her ankles while Miera struck Garcia with a wooden paddle. *Id.* at 105. The paddle "was split right down the middle, so it was two pieces, and when it hit, it clapped [and] grabbed." *Id.* at 165. Miera hit Garcia five times on the front of the leg between the knee and the waist. *Id.* at 277–78. After the beating, Garcia's teacher, Ruth Dominez, "noticed blood coming through [Garcia's] clothes," *id.* at 106, and, on taking Garcia to the restroom, was shocked to see a "welt" on Garcia's leg. *Id.* at 268. The beating made a two-inch cut on her leg, *id.* at 176, that left a permanent scar. *Id.* at 145. Shortly after this incident, Garcia's mother and father told Miera "not to spank Teresa again unless we were called, to make sure it was justified, and [Miera] said okay, no problems." *Id.* at 285.

The second beating at issue occurred on May 13, 1983. Miera summoned Garcia to her office for saying that defendant Judy Mestas had been seen kissing a student's father, Denny Mersereau, on a school bus during a recent field trip and that Mestas had sent love letters to Mersereau through his son.[3]

Miera proceeded to strike Garcia two times with the paddle on the buttocks. Garcia then refused to be hit again. Miera responded by calling defendant Edward Leyba, an administrative associate at the school. Leyba pushed Garcia toward a chair over which she was to bend and receive three additional blows. Garcia and Leyba struggled and Garcia hit her back on Miera's desk, from which she suffered back pains for several weeks. R. I, 106, 150–52. Garcia then submitted to the last three blows. The beating caused severe bruises on Garcia's buttocks, which did not stop hurting for two to three weeks. *Id.* at 160.

The report of the school nurse indicates that as a result of the beating Garcia's "buttocks [were] bright red with [a] crease across both." *Id.* at 109. Dr. Albrecht, a physician who treated Garcia, stated: "I've done hundreds of physicals of children who have had spankings ... and I have not seen bruises on the buttocks as Teresita had, from routine spankings ... [T]hey were more extensive, deeper bruises...." *Id.* at 271. Betsy Martinez, a nurse who examined Garcia, stated that if a child had received this type of injury at home she "would have called [the police department's] Protective Services." *Id.* at 270. The extent and severity of Garcia's bruises is independently supported by photographs of Garcia's buttocks taken on May 13 and May 18. *Id.* at 108–a, 113. Throughout the May 13 incident, Garcia kept asking Miera to allow her to call her mother. The principal refused, saying that she knew the law. R. I, 155.

Some of these allegations were disputed by defendants in their affidavits and testimony. For purposes of reviewing the district court's grant of summary judgment to defendants, however, we must determine whether the allegations and facts recited above, if believed by the trier of fact, would establish a constitutional wrong for which plaintiff could recover.

## I

■ We first consider whether corporal punishment of a school child, in any degree of excessiveness, can violate substantive rights under the Due Process Clause. Despite the Supreme Court's explicit disclaimer that it was deciding that issue in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977),[4] we believe that *Ingraham* requires us to hold that, at some point, excessive corporal punishment violates the pupil's substantive due process rights. Rejecting the four dissenters'

---

3. Mestas admits to sitting next to Mersereau on the bus, R. I, 209; and Miera testified that Mestas told her Mersereau was "her boyfriend." *Id.* at 190.

4. In *Ingraham* the Court declared: "We have no occasion in this case ... to decide whether or

under what circumstances corporal punishment of a public school child may give rise to an independent federal cause of action to vindicate substantive rights under the Due Process Clause." 430 U.S. at 679 n. 47, 97 S.Ct. at 1416 n. 47.

views that corporal punishment could violate the Eighth Amendment, the majority found the Due Process Clause applicable. The Court declared that "corporal punishment in public schools implicates a constitutionally protected liberty interest." *Id.* at 672, 97 S.Ct. at 1413. It recognized that among the liberty interests " 'long recognized at common law as essential to the orderly pursuit of happiness by free men' " is the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security," including "bodily restraint and punishment." *Id.* at 673–74, 97 S.Ct. at 1413–14. (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)). "[W]here school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated." *Id.* 430 U.S. at 674, 97 S.Ct. at 1414 (footnote omitted). This language plainly indicates that the infliction of corporal punishment can affect a fundamental right susceptible to substantive due process protection. *See id.* ("It is *fundamental* that the state cannot hold and physically punish an individual except in accordance with due process of law.") (emphasis added); *see also Bowers v. Hardwick,* — U.S. —, —, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (noting alternative definitions of fundamental rights as "implicit in the concept of ordered liberty," or "deeply rooted in this Nation's history and tradition").

Although the *Ingraham* opinion focuses on procedural due process, it discusses the history of corporal punishment in the law and applies a balancing test between the child's interest in personal security and the traditional view that a school may need to be able to impose "limited" or "reasonable" corporal punishment: "[T]here can be no deprivation of *substantive* rights as long as disciplinary corporal punishment is within the limits of the common-law privilege." 430 U.S. at 676, 97 S.Ct. at 1415 (emphasis added). Relying upon the adequacy of state criminal and tort remedies for excessive punishment, the low incidence of

abuse, and impracticality, the court held that "the Due Process Clause does not require notice and a hearing prior to the imposition of corporal punishment in the public schools, as that practice is authorized and limited by the common law." *Id.* at 682, 97 S.Ct. at 1418.

Although *Ingraham* makes clear that ordinary corporal punishment violates no substantive due process rights of school children, by acknowledging that corporal punishment implicates a fundamental liberty interest protected by the Due Process Clause, we believe that opinion clearly signaled that, at some degree of excessiveness or cruelty, the meting out such punishment violates the substantive due process rights of the pupil.

Indeed, such a view is compelling and the general principles underlying it have been recognized at least since *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), when the Supreme Court held that the forcible use of a stomach pump by police officers violated the individual's rights under the Due Process Clause. The Court declared that official conduct that "shocks the conscience," force that is "brutal" or "offensive to human dignity," offends the Due Process Clause. *Id.* at 172–74, 72 S.Ct. at 209–10. As Judge Friendly stated in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973):

> "*Rochin* ... must stand for the proposition that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law. If Rochin suffered such a violation of his constitutional rights by the police as to be entitled to invalidation of a conviction obtained as a consequence, he also was the victim of a violation sufficient to sustain an action under the Civil Rights Act."

*Id.* at 1032 (footnote omitted).

This circuit applied that notion in the context of a school, albeit one for problem children, in *Milonas v. Williams,* 691 F.2d 931 (10th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983).

We there affirmed the issuance of a permanent injunction against the Provo Canyon School for Boys enjoining, *inter alia,* the school's use of a practice nicknamed the "hair dance." The hair dance was a form of disciplinary action whereby a school employee would "grab one of the student's arms and clutch the boy's hair with his other hand." *Id.* at 942. Our decision in *Milonas* expressly endorsed the district court's finding that the "hair dance permitted unreasonably harsh school responses to the conduct of disturbed boys." *Id.* We rejected the argument that such physical abuse was reasonably related to the legitimate objectives of the Provo Canyon School, and concluded that the defendants' actions violated the plaintiffs' due process rights. *Id.* at 940, 942.[5]

The Fourth Circuit in *Hall v. Tawney*, 621 F.2d 607 (4th Cir.1980), a case closely analogous to the one before us, found a substantive due process right to be free of brutal, demeaning and excessive paddling by public school officials. The only appellate decision to the contrary is the Fifth Circuit decision that the Supreme Court reviewed in *Ingraham. See Ingraham v. Wright*, 525 F.2d 909 (5th Cir.1976) (en banc). There a majority of the en banc court found no substantive due process right and refused "to look at each individual instance of [corporal] punishment to determine if it has been administered arbitrarily or capriciously." *Id.* at 917.[6]

■■■ We here reaffirm our view, set out in *Milonas*, that at some point of excessiveness or brutality, a public school child's substantive due process rights are violated by beatings administered by government-paid school officials. We accept and agree with the Fourth Circuit's definition of the constitutional tort:

"the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court.

. . . . .

As in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."

*Hall*, 621 F.2d at 613.[7]

We believe the necessary inference from the Supreme Court's *Ingraham* decision is that excessive corporal punishment less offensive than the definition quoted above

---

5. Defendants argue that *Milonas* is distinguishable because the Provo Canyon School was not a school in the "ordinary" sense; while the Provo Canyon school offered "classes on a secondary level," 691 F.2d at 935, the students at Provo Canyon were "involuntarily confined." *Id.* at 942. But we noted in *Milonas* that students were generally "admitted to the Provo Canyon School at the insistence of one or both of their parents." *Id.* at 936. In the instant case, there are elements of compulsory school attendance under New Mexico state law. N.M. Stat.Ann. § 22–12–2 (1986). The dual educational/correctional nature of the Provo Canyon School therefore is insufficient to undercut *Milonas'* precedential value.

6. We, like Judge Godbold in dissent, "doubt that the majority really means what it says, and ... suspect that if in a future case the punishment inflicted has broken the victim's leg [the court] will face the issue and hold that substantive due process has been violated." *Ingraham*, 525 F.2d at 920–21 (Godbold, J., dissenting).

7. While this standard incorporates a subjective intent element of "malice or sadism," this element is largely redundant, because whenever "the force applied caused injury so severe, was so disproportionate to the need presented, and ... amounted to a brutal and inhumane abuse of official power literally shocking to the conscience," we should presume that the defendant had the requisite state of mind. Such a presumption of intent also avoids difficulties in applying the objectively reasonable standard for evaluating a claim of qualified immunity established in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation*, 95 Yale L.J. 126, 127 (1986) (*Harlow* "failed to distinguish between 'malice' as an element necessary to rebut an official's qualified immunity defense and 'state of mind' as an element of the plaintiff's substantive claim.").

does not rise to the level of a constitutional substantive due process violation. Such lesser violations implicate only a pupil's procedural due process rights. Thus, if the state were to provide no adequate remedy to deter this lesser degree of official conduct and compensate the victim of that misconduct, we would find a violation of procedural due process.

 We thus envision three categories of corporal punishment. Punishments that do not exceed the traditional common law standard of reasonableness are not actionable; punishments that exceed the common law standard without adequate state remedies violate procedural due process rights; and finally, punishments that are so grossly excessive as to be shocking to the conscience violate substantive due process rights, without regard to the adequacy of state remedies.

The district judge here found that New Mexico does provide adequate common-law remedies to afford Garcia constitutional procedural due process. Garcia has cited in supplemental authority a recent decision by another New Mexico federal judge to the effect that "New Mexico does not provide any tort remedy against public school teachers who inflict excessive punishment on their students." *McGinnis v. Cochran,* No. Civil 85–261–M, slip op. at 7 (D.N.M. June 3, 1985). But otherwise Garcia makes no procedural due process argument in this court, and we do not consider that issue.

## II

Concluding that grossly excessive corporal punishment may indeed constitute a violation of substantive due process rights under the governing law, we now examine whether that law was established with sufficient clarity at the time of the beating incidents at issue here.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court significantly changed the basis for establishing the defense of qualified immunity in § 1983 actions. Under the *Harlow* test, government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The decision eliminated the subjective considerations that underlay the prior analysis enunciated by the Court in *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *see also* S. Nahmod, *Civil Rights & Civil Liberties Litigation: A Guide to § 1983* § 8.03 at 382 (1985 Supp.). Determination of qualified immunity is now to be based "on the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

The district court in the case before us noted the split between the Fourth and Fifth Circuits on the substantive due process issue, and the Supreme Court's refusal to decide the question in *Ingraham,* and on that basis found the law was not "clearly established." It therefore found for defendants.

 The Supreme Court in *Harlow* expressly declined to address the issue of what constitutes "clearly established" law. 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32.[8] In confronting the issue of what de-

---

8. The *Harlow* decision stated that "[o]n summary judgment, the judge appropriately may determine ... the currently applicable law," as well as whether the law is clearly established. 457 U.S. at 818, 102 S.Ct. at 2738. This ability to determine "the currently applicable law," while not strictly necessary to decide immunity cases, is especially important under the *Harlow* test to maintain § 1983 as an important mechanism in the articulation of constitutional rights. *See, e.g., Hixon v. Durbin,* 560 F.Supp. 654, 665 (E.D. Pa.1983) (finding that defendants' actions were unconstitutional, while granting good-faith immunity because law was not clearly estab-

lished). Both courts and commentators have worried that the clearly established test will give officials "one liability-free violation" of the Constitution, *see People of Three Mile Island v. Nuclear Regulatory Commission,* 747 F.2d 139, 145 (3d Cir.1984); *see also* Comment, *Harlow v. Fitzgerald: The Lower Courts Implement the New Standard for Qualified Immunity Under Section 1983,* 132 U.Pa.L.Rev. 901, 926 (1984) (officials might believe they "have 'one bite' of the apple"). But if courts cannot prospectively articulate constitutional standards, there looms the even more unpalatable possibility of multi-

fendants should have known about the law, lower courts have had to determine the degree of "factual correspondence between the cases establishing law and the case at hand." Comment, Harlow v. Fitzgerald: *The Lower Courts Implement the New Standards for Qualified Immunity Under Section 1983,* 132 U.Pa.L.Rev. 901, 923 (1984). As the Third Circuit has noted:

"The Court in *Harlow* suggested that there must be some factual correlation, because an official may not be required 'to anticipate subsequent legal developments' nor know that 'the law forbade conduct not previously identified as unlawful.' *Harlow,* 457 U.S. at 818 [102 S.Ct. at 2738]. Some courts have required a relatively strict factual identity. Other courts have insisted that officials know and apply general legal principles in appropriate factual situations. Although officials need not 'predic[t] the future course of constitutional law,' *Pierson v. Ray,* 386 U.S. 547, 557 [87 S.Ct. 1213, 1219, 18 L.Ed.2d 288] (1967); they are required to relate established law to analogous factual settings."

*People of Three Mile Island v. Nuclear Regulatory Commission,* 747 F.2d 139, 144 (3d Cir.1984) (citations omitted). We follow the Third Circuit and adopt the second approach, "requiring some but not pre-cise factual correspondence and demanding that officials apply general, well developed legal principles." *Id.*

Applying this standard to the instant case, we hold that, at least by the time of the second beating, the law was clearly established that excessive corporal punishment could deny substantive due process.[9] Specifically, for the reasons stated in Part I, we find that *Milonas* was sufficiently analogous to the facts of this case to put defendants on notice as to the law of this circuit.[10] Whether the law was clearly established at the time of the first beating is a closer question, however, because it occurred before our decision in *Milonas.*

Looking first to Supreme Court precedent, we believe that the Court's refusal in *Ingraham* to address the substantive due process claim does not, without more, mandate a conclusion that the law was not clearly established. As discussed in Part I, the concept of the substantive due process right is implicit in *Ingraham.* Indeed, before the first beating of Garcia, the author of the *Ingraham* majority, Justice Powell, describing the contours of substantive due process, had cited with approval the proposition that "corporal punishment of students may have violated due

---

ple bites of a constitutionally forbidden fruit. This is especially true in the present factual context, in which excessive corporal punishment will seldom be official school policy and in which there may be other significant barriers to maintaining an injunctive suit. *Cf. City of Los Angeles v. Lyons,* 461 U.S. 95, 105–10, 103 S.Ct. 1660, 1666–69, 75 L.Ed.2d 675 (1983) (past victims of police chokeholds lack standing to seek injunction).

**9.** Even if Miera's five blows might be characterized as within the scope of the school's regulation, Penasco Board of Education Regulation § 4.18, R. I, 102 ("Corporal punishment may be administered only by the principal ... only with a paddle ... on the buttocks of student."), Leyba's pushing of Garcia toward the desk could still be fairly construed as a violation of the school's regulation. Moreover, "[c]onduct that is wrongful under section 1983 cannot be immunized by state law." *McClary v. O'Hare,* 786 F.2d 83, 85 (2d Cir.1986). While reference to the regulation is relevant to determining excessiveness of punishment, it is not determinative. Unfortunately, we easily can envision scenarios in which the severity of five blows to the buttocks could be constitutionally excessive. *See, e.g., Johnson v. Commonwealth,* 111 Va. 877, 69 S.E. 1104 (1911) (beating seven-year-old girl caused bladder rupture and resulted in death). The regulation does not create a five-blow constitutional safe harbor.

**10.** The defendants' alternative claim that *Milonas* was not decided long enough before the May 13 beating to put the Penasco school officials on notice of potential violations is without merit. *Milonas* was decided September 13, 1982, and rehearing was denied November 9, 1982—more than five months before the second beating. The defendants' assertion that the law library of the New Mexico Supreme Court received the bound volume 691 of Federal Reporter 2d in May 1983 itself implies that advance sheets were received several months earlier. The publication of advance sheets, as well as the availability of the decision much earlier by way of various legal and professional reporting services available to school officials and their legal advisors, were sufficient to give defendants notice.

process if it 'amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Parratt v. Tayor,* 451 U.S. 527, 553 n. 11, 101 S.Ct. 1908, 1922 n. 11, 68 L.Ed.2d 420 (1981) (Powell, J., concurring) (quoting *Hall,* 621 F.2d at 613). Moreover, the general principles underlying *Rochin* and its progeny clearly establish that egregious deprivations of fundamental rights deny substantive due process.

■ We agree that a direct conflict exists between the Fourth Circuit in *Hall,* which has rejected, and the Fifth Circuit in *Ingraham,* which has upheld, the constitutionality of grossly excessive corporal punishment.[11] But the decisions of one circuit court of appeals are not binding upon another circuit. *United States v. Carson,* 793 F.2d 1141, 1147 (10th Cir.1986). To give preclusive effect to a conflict among the circuits would effectively bind this circuit by the decisions of others. Moreover, the binding would always be in denigration of the constitutional right at issue. We hold that the conflict is relevant to the *Harlow* inquiry, but not controlling.

■ Despite the Fifth Circuit's position, we believe the law was clearly established before *Milonas* that some high level of force in a corporal punishment context would violate a child's substantive due process rights. We think a reasonably competent legal advisor to a school district should have realized that egregious invasions of a student's personal security would be unconstitutional. "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude." *Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981).

### III

■ Bare allegations of brutality in the administration of corporal punishment are insufficient to survive a motion for summary judgment supported by affidavits as provided in Fed.R.Civ.P. 56. *See Security National Bank v. Belleville Livestock Commission,* 619 F.2d 840, 846 (10th Cir.1979). Insubstantial or frivolous lawsuits may be dismissed without trial. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

The threshold for recovery on the constitutional tort for excessive corporal punishment is high. But the allegations with respect to the first beating, that this nine-year-old girl was held up by her ankles and hit several times with a split board of substantial size on the front of her legs until they bled—supported by evidence of a permanent scar—are sufficient. The allegations with respect to the second beating, that the punishment was severe enough to cause pain for three weeks—supported by pictures of the injured buttocks, an affidavit from an examining doctor that in his long experience he had not seen bruises like that from routine spankings, and an affidavit from an examining nurse that if a child had received this type of injury at home she would have reported it as child abuse—are also sufficient. These claims may not survive the crucible of the trial, but they overcome defendants' motion for summary judgment.

REVERSED and REMANDED for further proceedings consistent herewith.

---

11. Unfortunately *Harlow* declined to define how "'the opinions of this Court, [or] of the Courts of Appeals" ... should be evaluated in determining what is clearly established. 457 U.S. at 818 n. 32 (quoting *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978)). As a consequence, "lower courts are not informed whether two conflicting opinions from different district courts, or even a split decision in the court of appeals, makes the law sufficiently unclear to mandate the granting of immunity." *People of Three Mile Island,* 747 F.2d at 144.