Carl GERKS and Christina Gerks, individually, and as parents and next friends of Kristi Marie Gerks, a minor, Plaintiffs,

v.

Tracey DEATHE, individually, and in her teaching capacity; Pat Knuppenberg, individually, and in her teaching capacity; Nancy Krodel, individually, and in her capacity as Principal of Coronado Heights Elementary; Bill Spaeth, individually, and in his capacity as Assistant Superintendent of the Putnam City Public Schools; Ralph Downs, individually, and in his capacity as Superintendent of the Putnam City Public Schools, Independent School District No. 1 of Oklahoma County, Oklahoma, a political subdivision of Oklahoma, Defendants.

No. CIV–92–1681–A.

United States District Court, W.D. Oklahoma.

Oct. 6, 1993.

Shannon K. Emmons, Cary E. Hiltgen, Stacey L. Haws, Manchester Hiltgen & Healy, Jason C. Wagner, Lee Collins & Fields, Oklahoma City, OK, for plaintiffs.

William P. Bleakley, Linda M. Meoli, Center for Educ. Law Inc., Larry D. Ottaway, Timothy M. Melton, Foliart, Huff, Ottaway & Caldwell, Oklahoma City, OK, for defendants.

## ORDER

ALLEY, District Judge.

Before the Court is Defendants' Motion For Summary Judgment, pursuant to Fed. R.Civ.P. 56. Plaintiffs have filed a response to defendants' motion and defendants have filed a reply; therefore, this issue is ripe for decision. After reviewing the briefs and attached evidence, the Court rules as follows.

## STATEMENT OF UNDISPUTED FACTS

Plaintiff Kristi Gerks ("Kristi") is the daughter of plaintiffs Carl and Christina Gerks ("the Gerks"). On September 24, 1991, Kristi, who has been diagnosed as being mentally handicapped and suffering from cerebral palsy, was attending a special education class taught by defendant Tracey Deathe ("Deathe") at Coronado Heights Elementary School ("Coronado Heights") in the Putnam City School District ("School District").

On that morning, Deathe instructed the children to go to the bathroom before classes started at 9 AM. Kristi had a documented fear of bathrooms and, although Kristi refused to go with the other children, Deathe eventually persuaded her to do so. When Kristi did not return with the rest of the class after some time, Deathe asked the classroom assistant to check the bathroom. Upon returning, the assistant asked Deathe to come to the bathroom, where Deathe found three piles of excrement on the bathroom floor. Kristi was still inside the bathroom at the time. Deathe walked back to her class to get paper towels and then returned to the bathroom where she asked Kristi to help her clean up the piles. Kristi was reluctant to assist Deathe and would frequently stop to talk with Deathe, eventually ceasing to make any progress. Deathe then told Kristi that she was going to leave the bathroom and Kristi was going to remain inside and clean the mess. Kristi then re-

peatedly returned to Deathe with the same paper towel. After another while, Deathe told Kristi that she was going to hold the door of the bathroom shut while Kristi cleaned. Deathe then used a white ribbon to keep the bathroom door shut, checking Kristi's progress sporadically. After Kristi cleaned the bulk of the mess, Deathe attempted to clean Kristi and gave her new clothes.

While Kristi was in the bathroom, Deathe asked the school principal, Nancy Krodel ("Krodel"), to observe the mess and talk to Kristi. Krodel saw the piles and asked Kristi what happened, to which Kristi did not respond. Later, after she changed Kristi's clothes, Deathe took Kristi to Krodel's office where Krodel talked to her about her behavior and told her that big girls didn't make a mess on the bathroom floor. Krodel also showed Kristi a paddle to let her know what happened when children did not obey school rules. Krodel then let Kristi return to class and subsequently wrote up a disciplinary report about Kristi's behavior. The entire incident lasted almost the whole morning of that day, nearly three hours.

On October 4, 1991, the Gerks met with Assistant Superintendent Bill Spaeth ("Spaeth") and Dr. Siano about Kristi's placement. Spaeth offered them a placement for Kristi in the only other trainable mentally handicapped class, which was also in Coronado Heights. At the time, the Gerks indicated that Kristi was going to be re-evaluated and Spaeth mentioned that there could be other placement possibilities depending upon the results of the new evaluation. The Gerks rejected the offer of placement in the other class at Coronado Heights and refused to allow Kristi to return to the school. Spaeth agreed to provide Kristi with a homebound tutor pending the results of her testing and a meeting to discuss Kristi's education plan ("IEP") was to be scheduled. The Gerks subsequently moved out of the Putnam City School District to Edmond, Oklahoma. Kristi now attends public school in the Edmond Public Schools. After the meeting with Spaeth, the School District sent notices to the Gerks informing them of their right to have a due process hearing to review Kristi's educational plan; however, the Gerks did not file a request for a hearing.

On September 1, 1992, the Gerks filed an initial complaint against Deathe, teaching assistant Pat Knuppenberg ("Knuppenberg"), Krodel, Spaeth, School District Superintendent Ralph Downs ("Downs"), and the School District alleging violations of the Individuals With Disabilities' Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.* In addition, the Gerks alleged violations of Kristi's constitutional rights and various common law torts which resulted from the occurrences at Coronado Heights. On January 20, 1993, the Court stayed this action pending exhaustion of administrative remedies by the Gerks. On March 5, 1993, the plaintiffs reported that they were unable to obtain a due process hearing from the Oklahoma State Department of Education because they no longer lived in the original school district. On June 22, 1993, plaintiffs filed an amended complaint, alleging violations of Kristi's Fourteenth Amendment rights by the same defendants, pursuant to 42 U.S.C. § 1983. In addition, the plaintiffs alleged the state common law torts of false imprisonment and outrage against defendant Deathe.[1] The plaintiffs have asked for both actual damages, including medical and moving expenses, and punitive damages.

## DISCUSSION

Summary judgment is appropriate if the pleadings, affidavits and depositions "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Any doubt as to the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment. In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. *Board of Education v. Pico*, 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435

---

**1.** Defendants Knuppenberg and Spaeth were dismissed from the action by order of the Court on

July 22, 1993.

(1982). Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact; rather the party "must set forth *specific* facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

## A. Plaintiffs' Fourteenth Amendment Substantive Due Process Claim

■ In the context of school discipline, the standard for finding a substantive due process violation of the Fourteenth Amendment is "whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of power literally shocking to the conscience." *Garcia by Garcia v. Miera,* 817 F.2d 650, 655 (10th Cir. 1987) (quoting *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980)), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Plaintiffs claim that Deathe's actions on the morning of September 24, 1991 were so outrageous as to be a substantive violation of Kristi's Fourteenth Amendment Due Process rights. Deathe contends that nothing she did affected Kristi's Fourteenth Amendment rights. Nevertheless, in order to determine whether Deathe violated Kristi's rights, we must first look to whether the Fourteenth Amendment was implicated by anything that happened that morning.

The Fourteenth Amendment protects individuals from deprivation of life, liberty or property without due process of law. The closest analytic framework to Kristi's circumstance can be found in the jurisprudence concerning corporal punishment. In

*Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the Supreme Court held that corporal punishment did involve Fourteenth Amendment rights. The Court stated, "[A]t least where school authorities, acting under color of law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated." *Id.* at 674, 97 S.Ct. at 1414.[2] The *Ingraham* Court then continued by analyzing the circumstances surrounding corporal punishment, finding that a procedural due process violation does not occur as long as "common law constraints and remedies" remain. *Id.* at 683, 97 S.Ct. at 1419.

*Ingraham* left open the possibility that the use of corporal punishment may be so severe as to be a substantive violation of the Due Process Clause. The Tenth Circuit has addressed this issue in two main decisions. In *Milonas v. Williams,* 691 F.2d 931 (10th Cir.1982), the court found that the use of certain disciplinary techniques by a government-funded boarding school for problem children, such as a hair-pulling exercise called a "hair dance," violated the childrens' liberty interests. *Id.* at 942. Later, in *Garcia by Garcia v. Miera,* 817 F.2d 650 (10th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), the Tenth Circuit reaffirmed the view, first expressed in *Milonas,* that "at some point of excessiveness or brutality, a public school child's substantive due process rights are violated by beatings administered by government paid school officials." *Id.* at 655. In *Garcia,* the plaintiff had suffered two separate beatings which left her with multiple welts, scars and severe bruises. *Id.* at 653. In finding that a substantive due process violation had occurred, the court acknowledged that "the threshold for recovery on the constitutional tort for excessive corporal punishment is high." *Id.* at 658. Nevertheless, the court found that the severity of the beatings and injuries suffered by the child were sufficient to survive summary judgment on the issue. *Id.*

---

**2.** However, the Court also acknowledged that "there is, of course, a *de minimus* level of imposi-

tion with which the Constitution is not concerned." *Id.*

On the facts, it is clear then that by confining Kristi and forcing her to clean the mess in the bathroom, Deathe impinged on Kristi's liberty interests. However, that alone does not rise necessarily to the level of substantive violation. Plaintiffs have presented several pieces of evidence which bear on this issue. First, Kristi had a documented fear of bathrooms, particularly of being left alone in the bathroom, that was well known to Deathe. There is evidence that Kristi might have been left in the bathroom by herself for as long as two hours. Moreover, Kristi had been tested and found to have an IQ of about 50, giving her the mental age of a four-year-old and affecting her ability to understand Deathe's actions. Taking these facts in the light most favorable to plaintiffs as the non-moving party, the Court concludes that a rational jury could find that Deathe's actions were so demeaning and harmful to Kristi that they might have violated her substantive due process rights. Of course, this does not mean that plaintiffs will prevail at trial based upon this or any other evidence; naturally, the ultimate factfinding will be conducted by the jury. Nevertheless, the Gerks have alleged sufficient facts for jury decision. *See also Dickens by Dickens v. Johnson County Board of Education,* 661 F.Supp. 155 (E.D.Tenn.1987) (suggesting that a due process violation might be recognized for certain types of disciplinary action if the student was handicapped and the punishment was particularly severe).

### B. Plaintiffs' Fourteenth Amendment Procedural Due Process Claim

On a different issue, plaintiffs have presented the claim that Kristi's Fourteenth Amendment procedural due process rights were violated because the School District denied her a "free appropriate education." Plaintiffs' Amended Complaint at 6–7. It should be noted that this claim relates to Kristi's educational placement after the incident, not Deathe's actions in the bathroom. Nevertheless, beyond the bare assertion, the Gerks have provided the Court with no facts which demonstrate that there was a fault in the procedure employed by the School District in reviewing Kristi's plan, except to claim that they were "constructively ex-pelled" because of the District's failure to reassign Kristi.

In reality, plaintiffs' procedural due process claim is a rather conspicuous attempt to recast, as a federal constitutional issue, plaintiffs' claim for relief under the Individuals With Disabilities' Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.,* from their original complaint. Plaintiffs do nothing inherently wrong by taking a statutory claim and reshaping it in the form of a federal constitutional claim that is bound to fail. However, it bears stating for the record that procedural due process requires only that the government provide a party adequate opportunity to challenge the deprivation of a protected interest. It does not require that the government be at fault if an eligible party fails to use the procedure available to her.

Two points are worth making. First, pursuant to the IDEA and Oklahoma state educational department policy, plaintiffs were notified by the School District that they had the opportunity to have a hearing to review Kristi's placement. Plaintiffs themselves chose not to pursue this option. It was not until this Court stayed proceedings on January 20, 1993 that plaintiffs made any attempt to obtain some type of formal procedural review from the state. By that time, plaintiffs' own actions had made such a review impossible under the law.

Second, it should be evident that a procedural due process violation requires that there be at least some defect in procedure from the outset. Plaintiffs cannot create such a defect by avoiding or circumventing established procedure and then claim that it was faulty procedure that caused them harm. Had the Gerks obtained the review that they were entitled to before they left Putnam City and then were forced to remove Kristi from the School District, there could possibly be a cognizable procedural due process claim; however, based upon the facts, no such claim can reasonably be made.

### C. Plaintiffs' State Law Tort Claims

Finally, plaintiffs have alleged that Deathe committed two state common law torts: outrage and false imprisonment. In

response, defendants have asserted immunity under Oklahoma's Governmental Tort Claims Act, Okla.St. tit. 51, § 151, *et seq.* In particular, defendants cite § 163(C), which states, "In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant ..." *See* Okla.St.Ann. tit. 51, § 163(C) (West 1988). However, defendants fail to cite § 152(9) which defines the term "scope of employment" used in § 163(C). This section states that "scope of employment" means "performance by an employee acting in *good faith* within the duties of his office or employment or tasks lawfully assigned by a competent authority ..." *See* Okla.St.Ann. tit. 51, § 152(9) (West 1988 & Supp.1993) (emphasis added). Immunity under Oklahoma law thus turns on the factual question of "good faith" within the scope of employment. Consequently, summary judgment is premature at this stage of litigation because it would require the Court to make this factual determination without a proper evidentiary basis. Whether or not the defendants will succeed on this issue, the jury should be presented with the evidence and given the opportunity to determine if Deathe's actions satisfied the good faith standard of the statute. At trial, however, it will be necessary for the jury to be carefully instructed with respect to the appropriate burden of proof, in order to guide jurors properly as they weigh the relevant evidence.

 With respect to the substance of plaintiffs' tort claims, the Gerks have alleged sufficient facts for a reasonably jury to conclude in their favor on both counts. The tort of outrage, or intentional infliction of emotional distress, requires a finding of intentional or reckless extreme and outrageous conduct from which the plaintiff experiences severe emotional distress. *See Katzer v. Baldor Electric Co.,* 969 F.2d 935 (10th Cir. 1992); *Eddy v. Brown,* 715 P.2d 74 (Okla. 1986). At the summary judgment stage, the court has the responsibility of finding whether there is enough evidence to support such a claim. *See Breeden v. League Services Corp.,* 575 P.2d 1374 (Okla.1978). *See also Eddy,* 715 P.2d at 76 ("It is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous ..."). However, as the Oklahoma Supreme Court noted in *Breeden,* "[w]here, under the facts before the court, reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability." 575 P.2d at 1377. Given the facts as alleged by plaintiff, the Court finds that, while "reasonable persons may differ," there is enough evidence on the record for the plaintiffs to at least substantiate a finding of liability.

 Finally, the tort of false imprisonment consists of the "unlawful restraint by one person of the physical liberty of another." *See S.H. Kress v. Bradshaw,* 186 Okl. 588, 99 P.2d 508 (1940). Reasonableness is the standard in evaluating the conduct of a person who is alleged to have falsely imprisoned another. *See Swafford v. Vermillion,* 261 P.2d 187 (Okla.1953). The determination of "reasonableness" is an issue of fact which should be left to the jury. *Id.* at 192 ("[C]ases of this character, perhaps more than most, must often depend for determination in their various phases upon the conclusions of a jury."). As with the plaintiffs' other tort claim, plaintiffs have alleged sufficient facts for a jury to find that Deathe's actions were unreasonable, in particular, given Kristi's various disabilities.

## CONCLUSION

In light of the foregoing, Defendants' Motion For Summary Judgment is GRANTED with respect to plaintiffs' procedural due process claim and DENIED as to plaintiffs' substantive due process and state law tort claims. All other bases for employer liability raised in Plaintiffs' Amended Complaint, such as the School District's policies and customs and its failure to properly train and supervise its teachers, have not been briefed and are not herein decided.

It is so ordered.