**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 23, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAUL MUSKRAT, and MELINDA
MUSKRAT, as Parents and next
friends of Minor Child, J.M.,

      Plaintiffs-Appellants,

    v.

DEER CREEK PUBLIC SCHOOLS;
KAY ROGERS, individually and in
her official capacity as an employee of
Deer Creek Public Schools; DEBBIE
STRAUGHN, individually and in her
official capacity as an employee of
Deer Creek Public Schools; JESSICA
RENAKER, individually and in her
official capacity as an employee of
Deer Creek Public Schools,

      Defendants-Appellees.

No. 11-6194

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:-08-CV-01103-L)**

---

Jon E. Brightmire, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa,
Oklahoma (Andrew D. Schwartz, Rodney C. Ramsey, and Michael D. Gray,
Ramsey and Gray, P.C., Oklahoma City, Oklahoma, with him on the briefs) for
Appellants.

Jerry A. Richardson (Kent B. Rainey and Staci L. Roberds with him on the brief)
Rosenstein, Fist & Ringold, Tulsa, Oklahoma, for Appellees Deer Creek Public
Schools, Kay Rogers and Debbie Straughn, and Mark S. Rains, Mark Rains
Attorney at Law PLLC, Jenks, Oklahoma, for Appellee Jessica Renaker.

Before **TYMKOVICH**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Paul and Melinda Muskrat brought a civil rights action on behalf of their disabled son against the school district where he attended school for several years and against certain school district employees. The Muskrats alleged that the defendants unconstitutionally subjected their son to timeouts and physical abuse.

The school district moved to dismiss, arguing that the Muskrats had not exhausted their claims through administrative procedures established by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1491o. The district court denied this motion, ruling that the Muskrats had no obligation to exhaust their claims. The case then proceeded to discovery and the defendants eventually moved for summary judgment, arguing that no constitutional violation occurred. The district court agreed and granted defendants' motions.

We affirm in all respects. First, plaintiffs' claims do not fail for lack of exhaustion. Second, reaching the merits, the district court did not err in concluding the defendants' conduct did not shock the conscience, nor did it have an obligation to evaluate the claims under the reasonableness standard of the Fourth Amendment.

# I. Background

In reviewing a grant of summary judgment, we view the facts presented in the light most favorable to the nonmoving parties, the Muskrats. *See Dodds v. Richardson*, 614 F.3d 1185, 1191–92 (10th Cir. 2010).

## A. Factual Background

### 1. J.M.'s Disability

Paul and Melinda Muskrat's son, J.M., is a developmentally disabled child. During the time period relevant to this lawsuit, J.M. was between five and ten years old but had the mental age of a two- or three-year-old. In addition to his mental disabilities, J.M. had impaired gross and fine motor skills, as well as balance problems and a pattern of seizures.

J.M. attended Deer Creek Elementary School in Edmond, Oklahoma, from 2002 to 2007. Given his disabilities, he was a special education student with an individualized education program (IEP) under the IDEA.

### 2. J.M.'s Timeouts

Deer Creek Elementary had a special "timeout room" attached to J.M.'s classroom. The timeout room was small, although big enough for both a student and teacher to fit inside. It had a light fixture and a door without a lock. The door had a small window that was too high for children to see out of.

At school, J.M. was known to occasionally yell, throw, kick, hit, spit, throw tantrums, and otherwise exhibit disruptive behavior. As a result, teachers sometimes placed him in the timeout room.

The duration of these timeouts is not clear. The school had a policy of multiplying the student's mental age by two to set the maximum number of minutes a student could be in timeout on a single occasion, but the school did not always keep track of whether its employees followed this policy. As far as the record goes, the longest timeout J.M. endured was about four minutes. *See* Part II.B.2.a, *infra*.

It is also unclear whether students would be left alone in the timeout room, or whether a teacher or other staff member would remain present. In any event, the Muskrats eventually became concerned about the use of the timeout room and told school officials beginning in 2004 that J.M. should not be placed there. The Muskrats said J.M. did not have the mental maturity to understand the timeout room's purpose and it therefore only frightened him.

In November 2005, the school modified J.M.'s IEP to prohibit placing J.M. in a timeout room.[1] Deer Creek Elementary's principal, Debbie Straughn, nonetheless instructed at least one staff member (not a party here) to place J.M. in the timeout room if needed. Deer Creek Elementary's logs show that J.M. was

---

[1] Defendants claim the IEP was not modified until several months later, but we must accept the Muskrats' version of events for present purposes.

placed in timeout at least 30 times over the course of the 2004–05 and 2005–06 school years.

J.M. began to show increasing signs of stress during the 2005–06 school year, including sleeplessness, vomiting, and a frequent urge to urinate. His medical professionals also documented declining cognitive and physical functions. His medical professionals, however, never opined at the time that J.M.'s timeouts caused these symptoms. Nor did the Muskrats tell anyone at school that they believed J.M.'s timeouts caused these symptoms.

Just before the start of the 2006–07 school year, J.M.'s IEP was amended to state that school staff would neither subject J.M. to the timeout room nor place him in a classroom with a timeout room. The school initially honored this agreement, moving J.M. to a classroom without a timeout room. The school also decommissioned its timeout rooms generally for the 2006–07 school year.

A couple of months into the school year, however, school officials moved J.M. to yet another classroom. This new classroom featured a no-longer-in-use timeout room. The Muskrats claim that simple proximity to this timeout room caused J.M. additional anxiety.

### 3. *Alleged Physical Abuse*

The Muskrats claim that J.M. also suffered three instances of physical abuse at the hands of school staff.

The first instance occurred when J.M. was sitting in the cafeteria next to a special education teacher named Jessica Renaker. According to a nearby cafeteria worker, Renaker had a hand on J.M.'s shoulder and was attempting to calm him down for some reason. Renaker then quickly moved that hand and struck a quick open-handed "pop" (as the parties refer to it) on J.M.'s cheek. There was no wind-up or notable use of force, but the cafeteria worker believed that the "pop" was unprovoked. The record contains no evidence of continuing harm to J.M. from this incident.

The second instance of alleged physical abuse occurred when J.M.'s full-time aide, Kay Rogers, slapped J.M. on the arm hard enough to leave a red mark. The record again contains no evidence of continuing harm to J.M. from this incident.

The third instance of alleged abuse involved both Rogers and Renaker. On one occasion, they restrained J.M. in his desk for about two minutes by standing on either side of him, each one holding one of his shoulders so that he could not stand up. As with the previous two incidents, the record contains no evidence of continuing harm to J.M. from this incident.

### B. Litigation History

The Muskrats took J.M. out of Deer Creek Elementary after the 2006–07 school year, and eventually out of the Deer Creek schools altogether. In October 2008, they filed suit on their own and J.M.'s behalf. They named as defendants

Deer Creek Public Schools, Principal Straughn, Rogers, and Renaker. The complaint primarily alleged state-law torts but also asserted a 42 U.S.C. § 1983 claim, accusing the defendants of violating J.M.'s constitutional rights. The Muskrats' allegations relating to injury and damages largely focused on continuing emotional trauma and related medical expenses resulting from the timeouts.

The defendants moved to dismiss arguing that the district court lacked subject matter jurisdiction because the Muskrats had failed to exhaust their claims through an administrative process established under the IDEA. The defendants also asserted that the Muskrats' state-law torts failed to state a claim on which relief could be granted.

The district court rejected the defendants' IDEA exhaustion argument but agreed that the Muskrats state-law torts were deficient as pleaded. The district court gave the Muskrats leave to amend. The Muskrats satisfactorily amended and the case proceeded to discovery.

All defendants eventually moved for summary judgment, arguing that their behavior stated no constitutional violation under a Fourteenth Amendment "shocks the conscience" analysis. The district court agreed, entered judgment against the Muskrats on their § 1983 claim, and declined to retain jurisdiction over the remaining state-law causes of action.

The Muskrats then moved under Federal Rule of Civil Procedure 59(e), arguing that the district court had improperly dismissed the whole case because they could still proceed under a Fourth Amendment "reasonableness" theory in the alternative to a Fourteenth Amendment "shocks the conscience" theory. The district court denied this motion, finding that the Muskrats had never before asserted a Fourth Amendment theory, and it was too late to do so after the fact.

## II.  Analysis

The Muskrats contend the district court erred in granting summary judgment. We proceed by first considering our subject matter jurisdiction under the IDEA. Finding jurisdiction, we then examine the Fourteenth Amendment claim, agreeing with the district court that the defendants' conduct did not meet the controlling legal standard. We conclude by rejecting the contention that the case should be resolved under a Fourth Amendment reasonableness standard. That argument was not properly presented and preserved below.

### A.  IDEA Exhaustion

The defendants moved to dismiss for lack of jurisdiction, arguing that the Muskrats had not exhausted their claims through procedures specified in the IDEA. The district court denied this motion but the school district raises it again on appeal as an alternative basis to affirm the judgment.

### 1. *Statutory Framework*

The IDEA is a federal statute that "imposes obligations on the states to provide certain benefits in exchange for federal funds." *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1274 (10th Cir. 2007). A state accepting such funding must "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A).

A child's free appropriate public education must conform with his or her individualized education program (IEP). *Id.* § 1401(9)(D). "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining IEP in more detail).

If a parent objects to a school's implementation of the IEP, the statute entitles the parent to an "impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A). If the parent is unsatisfied with the outcome of the due process hearing, he or she "may appeal such findings and decision to the State educational agency." *Id.* § 1415(g)(1).

The IDEA requires parents to work through these administrative procedures before suing the school: "[B]efore the filing of a civil action under [federal laws protecting the rights of children with disabilities, such as the IDEA] seeking relief that is also available under this subchapter, the procedures under subsections (f) [due process hearing] and (g) [appeal] shall be exhausted . . . ." *Id*. § 1415(*l*).

### *2. Previous Treatment of the IDEA Exhaustion Requirement*

Before addressing the district court's disposition of the exhaustion issue, we pause to consider whether our prior case law correctly treats IDEA exhaustion as a jurisdictional matter. It is clear that we have done so, but it is less clear our analysis is legally correct. *See Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002) (characterizing IDEA exhaustion analysis as something the court must undertake to "satisfy itself of jurisdiction before addressing the merits of a claim"); *Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 724 (10th Cir. 1996) (treating IDEA exhaustion as a matter of subject matter jurisdiction); *see also Hayes v. Unified Sch. Dist. No. 377*, 877 F.2d 809, 810 (10th Cir. 1989) (stating in the context of the IDEA's predecessor statute that "failure to exhaust administrative remedies is jurisdictional"). But none of these decisions actually analyzes whether Congress intended IDEA exhaustion to be jurisdictional. Each case instead assumes without analysis that IDEA exhaustion is jurisdictional and proceeds under that assumption.

The trend is toward greater precision in jurisdictional analysis. Toward this end, the Supreme Court recently admonished the federal courts to employ the "jurisdictional" label carefully given the important differences between jurisdictional and non-jurisdictional requirements. We are to avoid "drive-by jurisdictional rulings," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998), that fail to consider the careful balance between non-waivable subject matter jurisdiction requirements and waivable "claim processing" provisions that do not invoke our subject matter jurisdiction, *Henderson v. Shinseki*, 131 S. Ct. 1197, 1203 (2011); *cf. Pub. Serv. Co. of N.M. v. NLRB*, 692 F.3d 1068, 1076 (10th Cir. 2012) ("[W]e must be wary about the word 'jurisdiction.' . . . [T]he Supreme Court has repeatedly warned lower courts against confusing 'claim-processing rules or elements of a cause of action' with true 'jurisdictional limitations.'").[2] Although "[c]ourts do not usually raise claims or arguments on

---

[2] *See also Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010) ("In light of the important distinctions between jurisdictional prescriptions and claim-processing rules, we have encouraged federal courts and litigants to facilitate clarity by using the term 'jurisdictional' only when it is apposite." (certain internal quotation marks and citations omitted; alterations incorporated)); *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Cent. Region*, 130 S. Ct. 584, 596 (2009) ("Recognizing that the word 'jurisdiction' has been used by courts, including this Court, to convey many, too many, meanings, we have cautioned, in recent decisions, against profligate use of the term." (certain internal quotation marks and citations omitted)); *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's

(continued...)

-11-

their own . . . they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson*, 131 S. Ct. at 1202. Further, a party may challenge subject matter jurisdiction at any time, even on appeal after losing below. *Id.* By contrast, a party may waive or forfeit the benefit of a nonjurisdictional rule. *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 203 (2d Cir. 2007).

Other circuits have split on whether IDEA exhaustion is jurisdictional. Most of these decisions appear to be the sort of drive-by rulings that the Supreme Court has cautioned against. Thus, for example, aligning with our own previous statements about IDEA exhaustion, the Second and Fourth Circuits have simply assumed without analysis that IDEA exhaustion is jurisdictional and proceeded on that basis. *See Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002) (stating without analysis that "[a] plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction");[3] *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002) (stating without analysis that "[t]he failure of the [plaintiffs]

---

[2](...continued)
adjudicatory authority." (certain internal quotation marks and citations omitted; alterations incorporated)).

[3] *But see Coleman*, 503 F.3d at 203 (questioning *Polera* in light of the Supreme Court's recent admonitions to use the "jurisdictional" label with care).

to exhaust their administrative remedies for [certain IDEA-related claims] deprives us of subject matter jurisdiction over those claims").

Most contrary decisions are no more thorough. The Seventh Circuit, for instance, deemed IDEA exhaustion nonjurisdictional by stating simply, "A failure to exhaust is normally considered to be an affirmative defense, and we see no reason to treat it differently here." *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006) (citation omitted). The Eleventh Circuit has similarly rejected jurisdictional status by briefly mentioning the availability of exceptions like futility and inadequacy of remedy. *N.B. v. Alachua Cnty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996).

It appears that only the Ninth Circuit has evaluated the question at any length. *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867–71 (9th Cir. 2011) (en banc). In concluding that IDEA exhaustion is not jurisdictional, the Ninth Circuit found it primarily noteworthy that the statutory language relating to exhaustion does not cast itself in jurisdictional terms. *Id*. at 896–70. The court further noted that, as a matter of policy, deeming IDEA exhaustion jurisdictional was unwise because it "is not a check-the-box kind of exercise" and its "inexact" nature could "haunt the entire proceeding, including any appeals" if treated as jurisdictional. *Id*. at 870. There is much to be said for these conclusions.

Ultimately, however, for purposes of this case IDEA exhaustion's status as a jurisdictional prerequisite is not at issue. *Cf. McQueen v. Colo. Springs Sch.*

*Dist. No. 11*, 488 F.3d 868, 873 (10th Cir. 2007) (raising the possibility that previous authority incorrectly labeled IDEA exhaustion as jurisdictional, but leaving the issue for another day). Had defendants failed to raise IDEA exhaustion below or failed to renew that question here, then our obligation to do so independently would turn on its jurisdictional or nonjurisdictional nature. But defendants did raise IDEA exhaustion below and do raise it again here.

We therefore need only decide the merits of the exhaustion question, to which we now turn.

### 3. IDEA Exhaustion in This Case

We review de novo the district court's conclusion that the Muskrats adequately exhausted their IDEA administrative remedies. *Dossa v. Wynne*, 529 F.3d 911, 913 (10th Cir. 2008). For clarity, we separate the alleged physical abuse from the timeouts.

### a. Physical Abuse

The Muskrats allege three instances of physical abuse: Renaker's pop or slap to the cheek, Rogers's slap on J.M.'s arm that left a red mark, and the incident in which Rogers and Renaker restrained J.M. by the shoulders to prevent him from leaving his desk. Each of these incidents potentially amounts to a common law tort.

No authority holds that Congress meant to funnel isolated incidents of common law torts into the IDEA exhaustion regime. We need not decide here

how to handle repeated instances of physical contact as part of an arguably necessary disciplinary program. Here, the Muskrats have alleged three scattered instances of potential battery. All three instances appear to have resulted from simple frustration with J.M. rather than any legitimate disciplinary goal. Requiring parents to raise such claims through an IDEA administrative hearing makes little sense. "[T]he policy supporting the [IDEA] exhaustion requirement . . . counsels that parents turn first to *educational* professionals, as opposed to courts, to remedy disputes over a child's *education*." *Cudjoe*, 297 F.3d at 1065 (emphasis added). Even though random violence may occur in the course of a child's education, we do not believe the child's parent must request a "no random violence" clause in the IEP. *See*, *e.g.*, *Padilla v. Sch. Dist. No. 1*, 233 F.3d 1268, 1274 (10th Cir. 2000) (finding IDEA exhaustion not required where the complaint alleges "severe physical, and completely non-educational, injuries"); *Franklin v. Frid*, 7 F. Supp. 2d 920, 925 (W.D. Mich. 1998) (excluding "random acts of violence" from IDEA exhaustion requirement).

Accordingly, the IDEA imposed no obligation on the Muskrats to exhaust their physical abuse claims.

### b. Timeouts

In contrast to the alleged physical abuse, complaints about use of timeouts as part of a student's IEP would generally fall within the IDEA exhaustion regime. As we held in *Hayes*, 877 F.2d at 813–14, a timeout-related claim must

be exhausted through the IDEA's statutory procedures. But here, although the timeouts have stopped and the Muskrats now seek only damages for the alleged continuing medical consequences, that circumstance does not necessarily excuse them from exhaustion.

"[D]amages . . . are ordinarily unavailable in administrative hearings held pursuant to the [IDEA]," but a plaintiff cannot avoid exhaustion simply because he or she asks for damages. *Cudjoe*, 297 F.3d at 1066. The question is whether the IDEA administrative process can redress the alleged problems in any degree, regardless of whether it is the redress the plaintiff seeks. *Id.* A plaintiff may not wait to bring IDEA-redressable claims until, for example, the child graduates or leaves the school district—thus leaving nothing but damages to adjudicate. *Id.* at 1067–68.

In this case, however, none of these principles prevents the Muskrats from bringing this suit. Although the Muskrats did not formally request a due process hearing under the IDEA, they nonetheless worked through administrative channels to obtain the relief they sought, namely, preventing J.M. from being put in a timeout room in the future. They made written and oral demands to school administrators not to place J.M. in timeout. *See, e.g.*, App. 673 (affidavit of Mrs. Muskrat stating that she orally requested in January 2005 that the school no longer place J.M. in timeout); App. 677–78 (Nov. 17, 2005 letter from Mrs. Muskrat to school officials listing various items for an upcoming IEP review,

including that "we do not want [J.M.] being put in time out"). The interested parties—J.M.'s parents and the school staff responsible for administering his IEP—then conferred, and the IEP was modified as a result. *See, e.g.*, App. 720 (affidavit of J.M.'s in-school physical therapist stating that school staff met with Mrs. Muskrat in late November 2005 and agreed not to subject J.M. to the timeout room); App. 699 (Aug. 10, 2006 IEP review form stating that J.M. will no longer be placed in timeout).

At this point, given the steps the Muskrats took and the relief they obtained, it would have been futile to then force them to request a formal due process hearing—which in any event cannot award damages—simply to preserve their damages claim. *See Hayes*, 877 F.2d at 814 (stating in the context of the IDEA's predecessor statute that "exhaustion of administrative remedies is not required if adequate relief is not reasonably available or pursuit of such relief would be futile").[4]

_____

[4] But as we said in *Cudjoe*,

> [W]e reject the argument that exhaustion will be excused because relief is no longer "available" at the time the plaintiff seeks to file a civil suit if relief was available at the time the alleged injuries occurred. To hold otherwise would transform the IDEA's exhaustion requirement into a "hollow gesture." *Frazier*[ *v. Fairhaven Sch. Comm.*, 276 F.3d 52, 63 (1st Cir. 2002)]. Plaintiffs

(continued...)

-17-

Accordingly, the Muskrats' lawsuit does not fail for lack of exhaustion. We therefore turn to the merits of their claims.

### B. Fourteenth Amendment "Shocks the Conscience" Claim

The due process clause of the Fourteenth Amendment prohibits "executive abuse of power . . . which shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In *Garcia v. Miera*, 817 F.2d 650 (10th Cir. 1987), we held that a form of the shocks-the-conscience test applies to school-inflicted corporal punishment:

----

[4](...continued)

> should not be permitted to "sit on" live claims and spurn the administrative process that could provide the educational services they seek, then later sue for damages. Were we to condone such conduct, we would frustrate the IDEA's carefully crafted process for the prompt resolution of grievances through interaction between parents of [children with disabilities] and the agencies responsible for educating those children.

> *Polera*, 288 F.3d at 490. *See also* [Terry Jean Seligmann, *A Diller A Dollar: Section 1983 Claims in Special Education Lawsuits*, 36 Ga. L. Rev. 465, 525–26 (2002)] (noting that measuring available relief at the time when the injury occurred ensures that "the IDEA process is not . . . ignored, with the potential consequence of more educational harm being done to the child until no remedy but damages remain").

*Cudjoe*, 297 F.3d at 1067.

> [T]he substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Id*. at 655 (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)). We now apply this standard to all school discipline cases, not just those based on corporal punishment. *See*, *e.g.*, *Harris v. Robinson*, 273 F.3d 927 (10th Cir. 2001) (applying *Garcia* to a teacher who made a student unclog a toilet with his hands); *Abeyta v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253 (10th Cir. 1996) (extending *Garcia* to verbal harassment inducing psychological harm, if sufficiently severe).

In this case, the district court decided at summary judgment that no defendant engaged in conscience-shocking behavior. We review that decision de novo. *Borchardt Rifle Corp. v. Cook*, 684 F.3d 1037, 1041–42 (10th Cir. 2012).

### 1. Physical Abuse

We first examine the alleged physical abuse, beginning with Renaker's pop to J.M.'s cheek. Even if unprovoked, this act does not shock the conscience. In particular, there is no evidence that it was a "brutal and inhumane abuse of official power." *Garcia*, 817 F.2d at 655. The evidence most favorable to the Muskrats instead shows that it was a rather mild slap. We may rightly condemn it, but it does not rise to the level of a constitutional tort.

-19-

For the same reasons, Rogers's slap on J.M.'s arm also does not rise to the level of a constitutional tort. Without any lasting harm or evidence of malice, this conduct does not shock the conscience.

Finally, the incident in which Rogers and Renaker restrained J.M. at his desk for a few minutes likewise does not shock the conscience. Viewing the record in a light most favorable to the plaintiffs, this incident showed, at most, "a merely careless or unwise excess of zeal" rather than a "brutal and inhumane abuse of official power." *Id.*

In short, the district court correctly concluded that J.M. suffered no conscience-shocking physical abuse.

### 2. Timeouts

#### a. Individual Liability

Among the three individual defendants, the district court found that only Principal Straughn had ever personally placed J.M. in the timeout room, and that Straughn did so only once. The Muskrats do not challenge either of these findings.

The single incident in which Straughn personally placed J.M. in the timeout room happened during the 2005–06 school year. Straughn was called to J.M.'s classroom to help calm him down after he had overturned chairs and knocked items from tables. According to the Muskrats, whose version of events the district court accepted as true for purposes of summary judgment,

-20-

> Straughn grabbed J.M.'s arms and forced him into the timeout room against his will. He yelled, screamed, cried, and held onto the door jamb to resist being forced into the timeout room. Straughn closed the door and placed a chair in front of the door with J.M. yelling to let him out. Straughn told the staff to continue to teach the class over the yelling and screaming.

App. 442–43. This timeout lasted approximately four minutes.

Accepting the Muskrats' view of events, as the district court did, we agree with the district court that this does not describe a conscience-shocking event. While we understand emotions can run high in maintaining classroom order, at the time of this incident the Muskrats had not yet made Straughn aware of the medical consequences that they now attribute to J.M.'s timeouts. Thus, although J.M. obviously did not want to be placed in the timeout room, this single incident lasting four minutes does not shock the conscience. The various details, such as placing a chair in front of the door, show at most a "careless or unwise excess of zeal" rather than a "brutal and inhumane abuse of official power." *Garcia*, 817 F.2d at 655.

Thus, the district court did not err in granting summary judgment to Straughn in her individual capacity.

### b. *Supervisory Liability*

At one point in their opening brief, the Muskrats assert, "Despite knowing of the agreement not to place J.M. in the timeout room because it was hurting

him, Straughn encouraged it." Aplt. Br. at 45.[5]  It is not clear whether the

Muskrats intended this stray comment to raise an argument that Straughn can be

held liable in a supervisory capacity for the timeouts in which she did not

personally participate, or whether it is simply another alleged fact in support of

the Muskrats' belief that J.M.'s overall treatment was conscience-shocking.

If the Muskrats meant to refer to liability under a supervisory theory, it is

insufficient to preserve that argument.  A plaintiff can hold a supervisor liable

under § 1983 only if: "(1) the [supervisor] promulgated, created, implemented or

possessed responsibility for the continued operation of a policy that (2) caused the

complained of constitutional harm, and (3) acted with the state of mind required

to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at

1199–1200.  Although the Muskrats recognized this in their summary judgment

briefing below, their briefs on appeal nowhere cite this standard, much less apply

it to Straughn.

Accordingly, the Muskrats have forfeited any argument that Straughn may

be liable in a supervisory capacity.  *See*, *e.g.*, *Adler v. Wal-Mart Stores, Inc.*, 144

F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening

brief are waived . . . .").

---

[5] "Hurting him" here refers to the general emotional trauma the Muskrats reported to the school, not the medical consequences they now attribute to the timeouts.  *Cf.* App. 1063–65 (deposition of Mrs. Muskrat in which she admits the Muskrats never told school officials that timeouts were producing severe stress symptoms in J.M.).

### c.  School District Liability

Lastly, the Muskrats alleged the school district was liable because the supposedly injurious conduct was pursuant to official policy or custom.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694–95 (1978).  The district court held that the school district could not be liable under *Monell* because the Muskrats had failed to show that any school district employee had committed a constitutional violation.  We have reached the same conclusion and therefore affirm the district court on this issue.

We further note that even if a jury question existed as to an individual defendant's liability, the Muskrats nowhere identify the school district policy that led to J.M.'s purportedly unconstitutional treatment.  They *do* assert that the district (or Deer Creek Elementary itself) had a policy of using timeouts only when a child posed a danger to himself or others, and the district court assumed that J.M. was never a danger to himself or others—meaning that Deer Creek staff members may have *violated* the school's timeout policy.  But if they violated the policy, we obviously cannot conclude that the policy caused J.M.'s alleged constitutional injury.

Accordingly, whether or not an employee committed a constitutional violation, the Muskrats' *Monell* claim fails for the additional reason that they have not identified a policy or custom which caused J.M. harm.

### C. Fourth Amendment Claim

#### 1. Standard of Review

Following summary judgment, the Muskrats filed a Rule 59(e) motion, arguing that the district court also should have analyzed their § 1983 claim under a Fourth Amendment reasonableness standard. The district court denied this motion, reasoning that the Muskrats had never before raised the Fourth Amendment as a possible source of evaluating § 1983 liability and could not do so for the first time after summary judgment.

"We review a district court's denial of a Fed. R. Civ. P. 59(e) motion for reconsideration under an abuse of discretion standard." *Ysais v. Richardson*, 603 F.3d 1175, 1180 (10th Cir. 2010). The Muskrats' motion, however, was in substance a Rule 60(b) motion for relief from judgment (rather than a Rule 59(e) motion to alter or amend the judgment)—but that is also reviewed for abuse of discretion. *Manzanares v. City Of Albuquerque*, 628 F.3d 1237, 1240 (10th Cir. 2010).

In addition, the district court's order is in some respects akin to an order denying a Rule 15(a) motion to amend. We review such denials for abuse of discretion, *Combs v. PriceWaterhouse Coopers LLP*, 382 F.3d 1196, 1205 (10th Cir. 2004), although in light of Rule 15's command to grant leave to amend "freely . . . when justice so requires," Fed. R. Civ. P. 15(a)(2). Nonetheless,

"granting leave to amend after entry of summary judgment is disfavored."

*Combs*, 382 F.3d at 1205.

### 2. Analysis

In their original complaint, the Muskrats' alleged under their § 1983 cause of action that

> J.M. has a constitutional right to freedom from bodily restraint and corporal punishment without due process of law. The abuse inflicted was so grossly excessive as to be shocking to the conscience. Also, the force applied caused injury so severe, and was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal, that it amounted to a brutal and inhuman[e] abuse of official power. Such right to be free from such abuse is clearly established and Defendants should have reasonably known of such right. Thus, the plaintiffs' substantive due process rights were violated as well [*i.e.*, in addition to their common law rights]. (See *Gerks v. Deathe*, 832 F. Supp. 1450 (W.D. Okla. 1993) [(applying a Fourteenth Amendment shocks-the-conscience test in a school discipline case)]; *Garcia by Garcia v. Miera*, 817 F.2d 650 (10th Cir. 1987) [(same).]

Supp. App. 46–47 (bracketed material inserted). The Muskrats did not specify which constitutional amendment provided the basis for relief, but the language employed and the cases cited plainly link this cause of action to the Fourteenth Amendment shocks-the-conscience test.

The school district moved to dismiss this complaint, arguing the IDEA exhaustion issue discussed previously, and also asserting that the Muskrats failed

to state a claim with respect to their state-law torts.  As noted, the district court rejected the IDEA exhaustion argument.  The court accepted, however, the argument that the Muskrats' state-law claims were defective.  To ensure it otherwise had subject matter jurisdiction, the district court also analyzed the Muskrats' § 1983 claim and concluded that the Muskrats had adequately pleaded a Fourteenth Amendment shocks-the-conscience claim.

The district court then gave the Muskrats leave to amend their state-law claims.  The Muskrats timely amended their complaint, reasserting their § 1983 cause of action verbatim, but adding to their state-law claims.

During discovery, the district court required the Muskrats to file a specific summary of the basis for each cause of action.  Concerning their § 1983 claim, the Muskrats simply reiterated that they sued under § 1983 and that J.M. had been deprived of a "constitutional or statutory right."  App. 397.

At summary judgment, all defendants challenged the Muskrats' § 1983 claim, arguing that no conscience-shocking behavior had occurred.  The Muskrats' response briefs focused entirely on rebutting that argument.  But those briefs also included a passing reference to the Fourth Amendment:

> To determine whether there is a substantive due process violation, the Court should analyze the unreasonableness of the violation of the child's liberty interests or seizure under the 4th and 14th Amendments. *Couture v. Board of Education of Albuquerque Public Schools*, 535 F.3d 1243, 1249 (10th Cir. 2008) [(a school discipline case litigated under both the Fourth Amendment's

> reasonableness standard and the Fourteenth
> Amendment's shocks-the-conscience standard)];
> *Ingraham v. Wright*, 430 U.S. 651, 674 (1977) [(holding
> that school-administered corporal punishment implicates
> Fourteenth Amendment due process rights)].

App. 160; 217; 306 (bracketed material inserted; parallel citations omitted).

Apart from this single reference to the Fourth Amendment, the Muskrats' briefs

focused exclusively on the shocks-the-conscience standard. They offered no

analysis under the Fourth Amendment, and it is clear from their briefs that the

reference was in support of a substantive due process claim. Accordingly, the

district court found this single reference to the Fourth Amendment insufficient to

preserve that theory, and therefore denied the Muskrats' Rule 59(e) motion.

The Muskrats insist on appeal that they never argued the Fourth

Amendment reasonableness standard at summary judgment (or at any other time)

because the defendants never raised it. In the abstract, the Muskrats are correct

that in most cases a party need only respond to the arguments asserted. In this

context, however, their explanation is not persuasive.

First, they assume that all parties were already on notice of a potential

Fourth Amendment claim. The Muskrats' only argument in this respect is that

their complaint accused the defendants of various things (*e.g.*, gross negligence

and willful disregard of constitutional rights) that "denote unreasonable conduct."

Aplt. Br. at 36. In other words, because the complaint alleged conduct that one

might describe as "unreasonable," the Muskrats argue that all parties should have

known that they based their claims on a "reasonableness" standard—and the only reasonableness standard that might apply derives from the Fourth Amendment. Thus, they say, all parties should have been on notice that the Muskrats based their claims in the Fourth Amendment. We reject this argument as inconsistent with the pleadings, and the parties' and the court's understanding of the claim.

Second, if the Muskrats had all along been intending to prove their case under a supposedly more lenient Fourth Amendment standard, we cannot understand why they did not at least mention that standard at summary judgment. At a minimum, one would expect a statement such as, "Notably, Defendants do *not* argue that their conduct satisfies the Fourth Amendment reasonableness standard." But the Muskrats said nothing of the sort.

Given all this, the district court correctly concluded that the Muskrats had never raised a Fourth Amendment argument before their post-summary judgment Rule 59(e) motion. New liability theories after summary judgment are discouraged. *Combs*, 382 F.3d at 1205. The district court therefore did not abuse its discretion in denying the Muskrats' Rule 59(e) motion.

The Muskrats nonetheless suggest that the district court should have addressed their claims under a Fourth Amendment standard without any prompting. But the district court had no such duty. The parties and we have located only one Tenth Circuit case applying a Fourth Amendment standard to school discipline. *See Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535

-28-

F.3d 1243 (10th Cir. 2008). Similar to the Muskrats' case, *Couture* involved a special education student whom school staff repeatedly confined in a timeout room on account of his violent outbursts and other highly disruptive behavior. His parents sued under both the Fourth and Fourteenth Amendments. The district court granted summary judgment in the school district's favor on the Fourteenth Amendment claim, reasoning that the Fourth Amendment was the true source of constitutional protection. The district court denied summary judgment on qualified immunity under the Fourth Amendment. *Id*. at 1249.

The school officials appealed the denial of qualified immunity and we reversed. We held that if timeouts are seizures under the Fourth Amendment (which we assumed without deciding), the timeouts at issue were reasonable because "[t]he educators were confronted with an almost impossible behavioral problem," *id*. at 1251, and they behaved reasonably under the circumstances, *id*. at 1251–57.

We did not address the Fourteenth Amendment issue because the plaintiffs did not appeal it. *Id*. at 1250. We gave no indication whether the district court correctly determined that the Fourth Amendment, rather than the Fourteenth, provided the appropriate constitutional protection. We did not cite any of our previous school discipline cases applying a shocks-the-conscience standard.

Although a few circuits apply a Fourth Amendment standard to at least some types of school discipline,[6] the shocks-the-conscience test has predominated in this circuit and the Fourth Amendment test has come up only in *Couture*—and only there because the plaintiffs specifically raised it. Accordingly, in this circuit, it is not settled law that the Fourth Amendment applies in school discipline cases; and it is not settled law that the district court had an obligation to evaluate the Muskrats' case under the Fourth Amendment reasonableness standard regardless of how they pleaded their claims.

Finally, we decline the Muskrats' invitation to consider whether we should abrogate our shocks-the-conscience standard in favor of a reasonableness standard in school discipline cases. Our previous panel decisions establish that shocks-the-conscience applies, *see Harris*, 273 F.3d at 930; *Abeyta*, 77 F.3d at 1256-57; *Garcia*, 817 F.2d at 655, even if *Couture* suggests that a Fourth Amendment standard might also apply. This panel cannot overrule prior panel decisions. *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993). We therefore will not evaluate the question here.

---

[6] *See Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906, 908–09 (9th Cir. 2003) (holding that "excessive force" by a school official should be analyzed under the Fourth Amendment); *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 171–72 (3d Cir. 2001) (distinguishing claims based on detention, to be analyzed under the Fourth Amendment, and claims based on use of physical force, to be analyzed under the Fourteenth Amendment); *Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014–15 (7th Cir. 1995) (applying Fourth Amendment standard to a situation in which a teacher "seized" a student by attempting to drag her out of a classroom by the elbow).

In sum, the district court did not err in failing to apply the Fourth Amendment to the Muskrats' § 1983 claims.

## III. Conclusion

For the reasons stated above, we AFFIRM the district court's grant of summary judgment as to all defendants.