**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RAYMOND VEGA, personally and as
personal representative of the estate of
Jose Martin Vega, deceased,

       Plaintiff - Appellee,

v.

BLAKE R. DAVIS, and certain
additional unknown agents of the
United States Bureau of Prisons,

       Defendant - Appellant.

No. 13-1268
(D.C. No. 1:12-CV-01144-RPM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY**[**] and **PHILLIPS**, Circuit Judges.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, participated as a panel member when this case was heard, but passed away before final disposition. "The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving this appeal." United States v. Wiles, 106 F.3d 1516, 1516 n* (10th Cir. 1997); see also 28 U.S.C. § 46(d) (noting circuit court may adopt procedure permitting disposition of an appeal where remaining quorum of panel agrees on the disposition). The remaining panel members have acted as a quorum with respect to this Order and Judgment.

This is an interlocutory appeal from a denial of qualified immunity. The plaintiff, Raymond Vega, brought an action under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), against former warden Blake Davis, alleging he had a role in Vega's brother's suicide. Following a hearing on Davis' motion to dismiss count one, which alleged deliberate indifference to a serious medical need in violation of the Eighth Amendment, the district court denied Davis' motion. Davis appeals this denial. We exercise jurisdiction under 28 U.S.C. § 1291 and reverse and remand with direction to grant Davis' motion as to count one.

## I. BACKGROUND

In May 2012, Raymond Vega ("R.V." or the "plaintiff") brought this action against Blake Davis and other unknown Bureau of Prisons ("BOP") agents. R.V.'s brother, Jose Martin Vega ("J.M.V."), was held at the United States Penitentiary, Administrative Maximum Facility near Florence, Colorado ("ADX" or "ADX Florence") when he committed suicide on May 1, 2010. The amended complaint (or "complaint") alleges two causes of action, both under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). Count one alleges the defendants were deliberately indifferent to J.M.V.'s serious medical needs, in violation of the Eighth Amendment. Count two alleges the defendants interfered with R.V.'s relationship with J.M.V., in violation of the First and Fourteenth Amendments.

2

The plaintiff rests his Eighth Amendment claim upon the assertion that J.M.V. suffered from a serious mental illness during his incarceration at ADX, that defendants exhibited persistent and deliberate indifference to his serious mental illness, and that as a result J.M.V.'s mental illness was not properly treated, which led to his suicide. The complaint alleges that the defendants regularly violate BOP policies and federal regulations by transferring seriously mentally ill inmates to ADX, by placing them in ADX's Control Unit, and by failing to provide these inmates any mental health care, including psychotropic drugs. The complaint alleges that the consequences are stark: ADX prisoners scream in their cells, mutilate themselves, have delusional conversations, and spread their feces in their cells. According to the complaint, since the time ADX opened, at least five other ADX inmates have committed suicide in addition to J.M.V. The complaint states that ADX began housing BOP prisoners in late 1994.

The complaint details J.M.V.'s history of mental illness. We briefly outline plaintiff's allegations here. After attacking an associate warden at another facility in March 2003, J.M.V. was transferred to Allenwood United States Penitentiary for nearly two weeks, where he was placed on suicide status, and then transferred to the United States Medical Center for Prisoners in Springfield, Missouri ("MCFP Springfield") for mental health evaluation and treatment. In April 2004, J.M.V. was transferred to ADX Florence and placed in the Control Unit. In December 2004, an ADX psychologist diagnosed J.M.V. with paranoid schizophrenia. In

3

March 2005, he was transferred to MCFP Springfield because of a suicide attempt, and his evaluation there found he had "a history of depression and antisocial personality disorder." Id. at 21. The complaint alleges that J.M.V.'s year-long stay at MCFP was unusually long when compared to the average length of stay, indicating J.M.V. had a serious mental illness. J.M.V. was transferred back to ADX in 2006, despite BOP's policy against transferring inmates with serious psychiatric illnesses to ADX. J.M.V. was again placed in the Control Unit, in apparent violation of federal regulations that bar placing inmates with "significant mental disorder[s]" into control units. Id. at 16-17. According to the complaint, this placement also prevented J.M.V. from receiving the mental-health medication he required.

The complaint alleges J.M.V.'s declining mental state was evidenced by his appearance and behavior. He looked "totally shot out," when he returned to ADX, his behavior changed between 2006 and 2008 from "normal" to a "'weird,' 'bat shit' crazy man who talked to himself," and thought people were poisoning him, he experienced "dramatic weight loss" from 2006 and 2008, and he began self-mutilating sometime between 2006 and 2008. Id. at 25-26. In July 2008, J.M.V. filed a pro se complaint in federal district court alleging severe mistreatment by ADX staff. J.M.V.'s complaint contained a host of allegations, including his contentions that he was regularly physically and sexually assaulted by ADX staff, was given poisoned food or food containing human waste, and was given a razor

4

blade by ADX staff, who encouraged J.M.V. to kill himself. Attached to J.M.V.'s complaint was documentation of the administrative complaints he had filed regarding these issues. According to the plaintiff, J.M.V.'s pro se complaint shows he was either seriously abused or had an untreated mental illness. J.M.V.'s lawsuit was dismissed on December 15, 2008.

The present complaint contains this description of J.M.V.'s final days. In 2010, J.M.V. had lost 50 pounds and was "largely incoherent." Id. at 26. In early April, J.M.V. "was in ambulatory restraints for three to four days, yelling and throwing feces." Id. He screamed on April 20, 2010 that "he was tired of the treatment he was receiving, and was going to do something about it." Id. On or about April 30, 2010, J.M.V. was again placed into ambulatory restraints, despite being in "obvious psychological distress." Id. ADX staff did not request mental health care for J.M.V. They "left him in his cell chained hand and feet, and utterly alone." Id. On May 1, 2010, J.M.V. was found dead in his cell. The coroner's report determined hanging was the cause of death, and the investigation indicated the injuries J.M.V. sustained were intentional and self-inflicted. The coroner's report stated the ADX health administrator indicated J.M.V. had a "long psychiatric history." Id. at 27.

The complaint states that "[a]t certain relevant times Defendant Blake R. Davis was the Warden at ADX Florence," including the day J.M.V. committed suicide. R. at 8. The complaint's only other references to Davis state:

5

96. As warden of ADX during certain periods relevant to this action, Defendant Davis was responsible for the care and safety of ADX inmates, including Vega.

97. Upon information and belief, during relevant periods Defendant Davis visited the ADX Control Unit and spoke with inmates confined there, and through those interactions and through other means became familiar with events occurring in the Control Unit and the condition of the prisoners confined there.

98. Upon information and belief, Defendant Davis was aware of the discipline imposed on ADX inmates, serious medical issues among the inmates, and other information bearing on the care and well being of inmates under his custody and control, including Vega.

99. Upon information and belief, during relevant periods Defendant Davis had the discretionary authority to authorize the transfer of ADX inmates, including Vega, to medical facilities such as MCFP Springfield, where they could be treated for mental health problems more serious than could effectively be treated at ADX.

100. Upon information and belief, Defendant Davis knew about or was willfully ignorant of Vega's serious medical needs, his deterioration while confined in the ADX Control Unit, the availability of constitutionally adequate mental health services at BOP medical facilities such as MCFP Springfield, and the means of accessing other mental health services required by Vega. Nevertheless, Defendant Davis failed and refused to make any of those resources and medical services available to Vega.

101. Upon information and belief, Defendant Davis also

failed to prevent the abuse of Vega by ADX staff, failed to ensure that Vega was adequately fed and safely housed, failed to implement adequate suicide prevention programs at ADX, and otherwise failed to address Vega's serious, chronic and growing mental illness. As a result, Vega's mental deterioration continued, and ultimately resulted in his death. Defendant Davis's failure to discharge their obligations relating to Vega was a legal cause of Vega's death.

102. Upon information and belief, Defendant Davis engaged in similar misconduct with respect to other ADX inmates, some of whom have injured or killed themselves as a result, and many of whom have suffered unnecessarily and for months or years on end because of the failure of Defendants and other ADX staff members to provide constitutionally required mental health care to inmates whom they knew or should have know [sic] suffered from serious mental illnesses.

Id. at 28-29.

Davis moved to dismiss, noting first of all that he was not warden in 2004-2008, when many of the events relating to J.M.V.'s history of mental illness occurred. Davis also argued the complaint failed to show he was personally involved in any constitutional violation, failed to show he had the requisite state of mind for an Eighth Amendment violation, and improperly extended Bivens to the First and Fourteenth Amendments in count two. Davis also argued that he was entitled to qualified immunity on both claims.

At the hearing on Davis' motion to dismiss, the district court granted Davis' motion on count two but denied it on count one. Although the court acknowledged

7

that Davis was not warden until 2009 and the complaint did not allege Davis ever personally observed J.M.V., the court concluded that Davis' position as warden imposed upon him "a responsibility to see to the health and welfare" of the inmates, and "a special responsibility" to those in the Control Unit, making it "hard" for the court to agree it "should dismiss this case because there is no specific allegation of specific knowledge." Id. at 378. The court stated that the information about "who observed [J.M.V.] day to day and what reports" existed were "what ought to be discovered in this case." Id. at 379. The court asked if Davis was "required by his position as warden of the institution to look into the conditions" of the ADX inmates. Id. at 380. Davis' counsel agreed that this was generally true, but stated that if this general responsibility were sufficient to show personal participation in a constitutional violation, wardens could be "sued individually for anything that happens in the institution." Id. The court asked why the events in April 2010, when J.M.V. was in restraints and self-harming, did not come to Davis' attention. Defense counsel stated there were no facts indicating Davis was aware of anything that happened before 2009. The court asked, "Doesn't he have records in front of him?" Id. at 381. Defense counsel agreed he did, but stated there were over 450 inmates at ADX. The court responded, "not all 450 inmates are in the Control Unit, and not everybody in the Control Unit is manifesting mental health conditions as [J.M.V.] did, right?" Id. Defense counsel agreed, but replied "there still are no facts alleged that he actually

8

knew of any risk and that he subjectively drew that bad intent," as required by the Eighth Amendment. Id. The court then denied Davis' motion to dismiss count one, but the court granted the motion to dismiss count two. Plaintiff does not appeal the dismissal of count two.

## II. ANALYSIS

### A. Does the complaint allege facts showing Davis' personal participation?

Davis' first argument is that the district court erred in denying qualified immunity because the plaintiff failed to allege facts showing Davis was personally involved in any constitutional violation. We review de novo the legal question of "whether a complaint sufficiently alleges a clearly established violation of law." Keith v. Koerner, 707 F.3d 1185, 1187 (10th Cir. 2013). This involves considering both (1) whether the plaintiff has pled facts showing a violation of a constitutional right, and (2) whether that right was clearly established when the defendant acted. Id. at 1188. When evaluating a complaint, "all well-pleaded allegations of the complaint are accepted as true," and although "factual assertions are taken as true, legal conclusions are not." Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1144 (10th Cir. 2013). The complaint must present a plausible claim, which means that the pleaded "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1144-45 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

In a Bivens action, the plaintiff has a private right of action for damages

against federal officers that violate the plaintiff's constitutional rights. Iqbal, 556 U.S. at 675. In order to state a Bivens claim, the plaintiff must show that each defendant violated that constitutional right through his or her "own individual actions," because "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Pahls v. Thomas, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting Iqbal, 556 U.S. at 676)). The complaint must "make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations.'" Id. (quoting Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)). It is therefore "incumbent upon a plaintiff to 'identify specific actions taken by particular defendants' in order to make out a viable § 1983 or Bivens claim." Id. at 1226 (quoting Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 532 (10th Cir. 1998)).

Before beginning our analysis, we first respond to the plaintiff's argument that his "unique and profound informational asymmetries" justify denying the motion to dismiss. Appellee's Br. at 16. Or put another way, the plaintiff's lack of access to relevant information, when compared to defendant's access, should not result in the dismissal of his claim. The Supreme Court has already considered, and rejected, this very possibility. Iqbal, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff

10

armed with nothing more than conclusions."); id. at 686 ("We decline respondent's invitation to relax the pleading requirements on the ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity . . . ."). We clearly must reject this argument as well.

Davis argues the district court erred in denying qualified immunity because the complaint fails to plead facts showing Davis' personal participation. He argues that all pre-2009 incidents should be disregarded because Davis was not warden at that time.[1] Further, Davis argues the complaint seeks to hold him liable "solely on the basis of his position as the warden." Appellant's Br. at 19. The complaint does not allege Davis "knew or ever interacted with inmate Vega." Id. at 22. Davis also argues that the complaint provides no facts to support its conclusory allegations that Davis knew about the discipline of ADX inmates, that he knew about serious medical issues among the inmates, or that he knew about or was willfully ignorant of J.M.V.'s medical needs. Davis argues that under Iqbal,

---

[1] The plaintiff does not dispute that Davis was not warden until 2009. After oral argument, Davis submitted supplemental authority, pursuant to Fed. R. App. P. 28(j), stating he served as warden of ADX from July 13, 2009 until April 21, 2012. We judicially notice this fact under the Federal Rules of Evidence, Rule 201. Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1219 n.2 (10th Cir. 2011) (noting that under Rule 201, judicial notice may be taken "whether requested or not," and "at any stage of the proceeding") (quoting Fed. R. Evid. 201(c), (f)).

such conclusory statements are not entitled to a presumption of truth. Davis also contends that the complaint fails to meet the standard for supervisory liability set forth in Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010).

Given that Davis was not warden until July 13, 2009, the only way Davis could conceivably be linked to J.M.V.'s suicide is through his neglect in addressing J.M.V.'s untreated mental illness from July 13, 2009 to May 1, 2010, by failing to use his discretionary authority to transfer J.M.V. out of ADX to MCFP Springfield to receive treatment.[2] For this claimed neglect to constitute personal participation in the constitutional violation alleged, Davis must also have acted with the requisite mental intent, which is Davis' second issue on appeal. We thus proceed to address that question.

---

[2] The complaint could also be read to allege that Davis failed to correct the systematic denial of mental health care to Control Unit inmates during his tenure as warden. This kind of allegation would likely fall under Dodds, which requires the plaintiff show: "(1) the defendant promulgated, created, implemented or **possessed responsibility for the continued operation of a policy** that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." 614 F.3d at 1199 (emphasis added). However, the plaintiff has specifically stated he is not relying on a theory of supervisory liability under Dodds. To the extent the plaintiff seeks to employ a theory of supervisory liability not outlined in Dodds, he has failed to argue how such a theory survives Iqbal. These arguments are thus waived. Muskrat v. Deer Creek Pub. Sch., 715 F.3d 775, 788 (10th Cir. 2013) ("'Arguments inadequately briefed in the opening brief are waived.'") (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998)).

12

B. Did the district court err in denying qualified immunity based on the plaintiff's failure to allege Davis was deliberately indifferent?

Davis' second issue on appeal is that he is entitled to qualified immunity because the plaintiff failed to support his allegation that Davis violated J.M.V.'s Eighth Amendment rights. An Eighth Amendment claim based upon inadequate medical attention requires the plaintiff show "deliberate indifference to serious medical needs." Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotation and citation omitted). Davis' appeal focuses on the second prong of this test, which requires the plaintiff "show that the defendants knew [the plaintiff] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." Id. at 1089 (citation omitted). The defendant-official must both "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). If the risk was "obvious," this may be circumstantial evidence of the official's subjective state of mind, though an obvious risk is not conclusive because "a prison official may show that the obvious escaped him." Id. (quoting Farmer, 511 U.S. at 842, 843 n.8).

Davis argues the complaint fails to allege facts supporting the plausible inference that Davis "was aware that inmate Vega was at a substantial risk of

13

serious harm or that Mr. Davis actually drew such an inference that the risk of harm existed." Appellant's Br. at 29. Although the complaint does allege that Davis "knew about or was willfully ignorant of Vega's serious medical needs," Davis notes that this allegation is conclusory and not supported by any facts in the complaint. Id. at 30. Davis contends there are no facts showing Davis "knew anything at all about inmate Vega," including his mental state, lack of treatment, and risk of suicide. Id.

Our first step is to eliminate all "allegations in the complaint that are not entitled to the assumption of truth." Iqbal, 556 U.S. at 680. The plaintiff's conclusory allegations about Davis in paragraphs 97, 98, and 100 are not supported by any facts, and thus not presumed to be true. We also cannot rely on the pre-2009 events. Had Davis been warden when J.M.V. was transferred to ADX, or to the Control Unit at ADX, or when he filed his administrative complaints alleging assaults and poisoned food, we would have at least some basis upon which to draw the inference that Davis knew J.M.V. was at risk due to his untreated mental illness. Although the plaintiff acknowledges that Davis was not warden when these events occurred, he fails to appreciate how this removes these events from our consideration in determining whether Davis was deliberately indifferent. See Appellee's Br. at 24-25. After removing irrelevant or conclusory allegations, we are left with only three facts that could begin to support an inference of Davis' knowledge: 1) J.M.V.'s records documenting his mental health

14

issues, provided there is an inference Davis would have read them, 2) Davis' visit to the Control Unit, and 3) the events in April and May 2010.

Our second step is to determine whether these facts are sufficient to allow us "to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678, and we conclude that they are not. The mere presence of records, by themselves, does not create the reasonable inference that Davis read them. The plaintiff fails to explain why it is reasonable to infer that a warden would review all of the records of each inmate, or each inmate in the Control Unit, or J.M.V.'s records in particular. And as Davis points out, J.M.V.'s records were "voluminous," making their review more time-consuming and less likely. Appellant's Reply Br. at 23. Davis' one visit to the Control Unit does not advance the plaintiff's claim because there is no indication that this visit made him aware of J.M.V.'s mental illness or lack of treatment. The events in April and May 2010 also have no tie to Davis, as there are no facts indicating that Davis was informed of J.M.V.'s actions or the ADX staff's treatment of J.M.V. We agree with Davis that it is not plausible to infer that "a warden is aware of everything that happens to each inmate in his custody." Id.

In his response brief, the plaintiff essentially argues that the warden could be liable for any suicide by a mentally ill person in the Control Unit because of his knowledge that there were mentally ill people in the Control Unit that were not receiving mental health services. However, the complaint's only non-conclusory

15

fact supporting the inference that Davis knew about the lack of treatment in the Control Unit was his single visit there. Although it is certainly *possible* that on his tour he witnessed enough in the Control Unit to make it obvious that there was a systematic denial of mental health care, we conclude from our "judicial experience and common sense" that a single visit does not "plausibly suggest" that Davis knew enough to be deliberately indifferent to Control Unit inmates. See Iqbal, 556 U.S. at 679, 680.

This lack of factual support distinguishes this case from Keith, 707 F.3d at 1189, and Smith v. United States, 561 F.3d 1090, 1093-94 (10th Cir. 2009). In Keith, a government report noted several prior instances of sexual misconduct, inconsistent administrative responses to allegations of sexual misconduct, and failures at the policy level that created the opportunity for sexual misconduct. 707 F.3d at 1189. These facts together supported the plausible inference of deliberate indifference by the warden, who had served in that position "over a period of years" during which the prior instances of sexual misconduct occurred. Id. at 1188, 1189. Similarly, in Smith there were facts indicating that the warden knew about a report that documented the presence of asbestos in the prison. 561 F.3d at 1094, 1105. Davis' single visit of unknown duration to the Control Unit pales in comparison to the facts in Keith and Smith.[3]

---

[3] See Keith, 707 F.3d at 1188-89 ("[The warden] characterizes Ms. Keith's argument as: because [the warden] had the responsibility for managing the facility (continued...)

Certainly, there is much in this complaint that, if true, is deeply concerning. However, we are counseled by Iqbal to remember that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." 556 U.S. at 677. The fact that allegations in this complaint, if true, expose significant shortcomings in the treatment of mentally-ill prisoners at ADX cannot negate that requirement.

We REVERSE the district court's order denying Davis' motion to dismiss count one and REMAND with direction to grant Davis' motion to dismiss count one.

Entered for the Court

Mary Beck Briscoe
Chief Judge

---

[3](...continued)
and imposing discipline, and did in fact discipline employees for undue familiarity and sexual misconduct," the warden "must have been aware" of an employee's intent to engage in illegal sexual acts with the plaintiff, an inmate of the prison. "Of course, that alone would be insufficient to withstand a motion to dismiss. But there is more." (internal citation omitted)).

17